# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-3345

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

DAVID HAMPTON TEDDER,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 02-CR-105-C-01—**Barbara B. Crabb**, *Chief Judge.*

———————

ARGUED FEBRUARY 23, 2005—DECIDED APRIL 6, 2005

———————

Before CUDAHY, EASTERBROOK, and WILLIAMS, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* For using his law license to help offshore gambling businesses conceal their identities and income, David Tedder has been convicted of conspiring to defraud the United States, see 18 U.S.C. §371, by assisting a wagering enterprise that violated 18 U.S.C. §1084, plus three counts of money laundering, see 18 U.S.C. §1956(h), §1957. No longer a member of the bar, Tedder is serving a sentence of 60 months' imprisonment and has been fined more than $1 million; the district court also ordered almost $2.8 million to be forfeited. (Tedder resigned from the California bar to forestall resolution of disciplinary charges.

He has been enjoined from practicing law in Florida, which he had done there despite his lack of a license. *Florida Bar v. Tedder*, 790 So. 2d 1110 (2001) (table).)

Section 1084(a) is a simple statute, providing: "Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers," commits a crime. Tedder created and operated a business called Clear Pay to move money between gamblers in the U.S. and a Curacao business called Gold Medal Sports, which Tedder's clients operated as a sports book. The Attorney General of Florida had warned Western Union not to wire funds to Gold Medal Sports; Clear Pay offered a solution by preventing Western Union (and other intermediaries) from learning the funds' ultimate destination. Tedder also created Bahamian shell corporations, purportedly engaged in software development, to help his clients hide their involvement, and wired the gambling business's profits to nominee accounts of which he was the custodian, plus other foreign investments with a patina of legitimacy.

Tedder told his clients that the disguise would be impenetrable. He was wrong. The clients (Duane Pede and Jeff D'Ambrosia) were caught, pleaded guilty, and testified against Tedder—who contended that he had been *so* mistaken that he had not appreciated the legal problem. Although he was a lawyer, knew about §1084, and even knew about criminal prosecutions of similar ventures (after which he whipped up still more layers in a futile attempt to shield his clients), Tedder told the jury that he thought that Gold Medal Sports and Clear Pay were upstanding businesses operated in compliance with all laws. This was essentially the tax protester's

defense that he just didn't think that the law, however clear, applied to his endeavors. See *Cheek v. United States*, 498 U.S. 192 (1991). The district judge gave appropriate instructions to the jury, which did not believe Tedder's professions of ignorance and convicted him. Tedder maintained that he drew his understanding of federal law from observing conduct—Gold Medal Sports was not the only offshore gambling enterprise—as if the existence of bank robberies shows that it is lawful to steal money at gunpoint. Testimony about this curious approach to legal "research" did more to demonstrate Tedder's mendacity than to make out a defense. His multifarious endeavors to hide the source and disposition of Gold Medal Sports' funds revealed his true beliefs.

Tedder does not contest the sufficiency of the evidence. Instead he contends that the district judge erred in rulings about evidence. His lead argument is that the judge should have allowed him to present additional witnesses who would have testified that they do not think that §1084 prohibits the sort of transactions in which Tedder engaged. (Section 1084 is not itself a specific-intent crime, but only a person who knows that the money has an unlawful source commits the offense of money laundering.) Tedder did not propose to present an advice-of-counsel defense based on what other persons told him. Had he done that, he would have been required to waive the attorney-client privilege and allow the prosecutor access to everything he said to his advisers and what they told him in return. Instead he wanted to show only that his (asserted) belief was widely shared by lay persons. How non-lawyers' misunderstandings could have reflected on a lawyer's legal analysis puzzled the district judge—it was at best weak circumstantial evidence about how the statute was understood. So the judge exercised her authority under Fed. R. Evid. 403 to curtail tangential or cumulative evidence and said that she would limit to two (or one plus Tedder himself, should he testify,

as he did) the number of such witnesses. Tedder replied that two witnesses on this subject would suffice, thus waiving the argument he now advances.

By testifying, Tedder put his veracity at issue. To address that subject, the prosecutor called three witnesses who testified that Tedder is not a truth-teller. Under Fed. R. Evid. 608(a), this evidence had to take "the form of opinion or reputation" rather than specific instances of deceit. One witness, a lawyer, testified that Tedder's reputation for truthfulness in the legal community was "poor." Tedder's brothers were the other two witnesses; both testified that they had low opinions of his honesty. He contends that the family had been estranged for so long that the brothers' views were out of date, but honesty is more like climate than like weather: it is a stable attribute even though subject to daily variability. Rule 608(a) does not contain a time limit, so the fact that Tedder had not spoken with his brothers for a decade did not compel the judge to block them from testifying. See *United States v. Pacione*, 950 F.2d 1348, 1354 (7th Cir. 1991). The long break in family relations was a subject for cross-examination and argument by counsel. As for the fact that the questions and answers used the word "honesty" rather than "truthfulness" (the language of Rule 608): lay jurors would be unlikely to perceive a difference, and neither did Tedder's lawyer, who failed to object. Using the vernacular was not plain error. See *United States v. Manske*, 186 F.3d 770, 775-76 (7th Cir. 1999).

The district judge told the jury to consider character evidence "in the same way as all the other evidence in the case." That came from instruction 3.06 in the circuit's pattern jury instructions, captioned "Character and Reputation of Defendant." Tedder says that the judge instead should have used instruction 3.12, captioned "Character of a Witness." Tedder was both a witness and the defendant, so both versions could be apt. But the two instructions are materially identical. Instruction 3.12 would have told the jury to "con-

sider this evidence in deciding what weight you will give to Tedder's testimony." Both 3.06 and 3.12 are uninformative; their only use is in implying no special rules govern character and reputation evidence. See *United States v. Burke*, 781 F.2d 1234, 1238-42 (7th Cir. 1985). The jury got that message, and there was no other to convey, so the two instructions were equally good (or equally inconsequential).

Tedder proposed to call a reputation witness of his own on rebuttal. The district judge said no, because the only witness Tedder tendered had been in the courtroom during the trial, and the judge had entered an order forbidding testimony by anyone who had listened to other witnesses. See Fed. R. Evid. 615. Tedder now says that the judge should have disregarded that order, but she did not abuse her discretion in sticking to it. Cf. *Wardius v. Oregon*, 412 U.S. 470 (1973) (enforcement of alibi-notice rule is compatible with due process even when it leads to preclusion of main defense evidence); *Taylor v. Illinois*, 484 U.S 400 (1988). If Tedder wanted this witness available for rebuttal, he should have kept him out of the courtroom. Or counsel could have called someone else—if there was anyone else who would testify under oath that Tedder had a good reputation for truthfulness.

We turn to sentencing and start with the fine. Although the Guidelines' fine table prescribes a maximum of $100,000 for someone with Tedder's offense level, there is an exception when the statute authorizes a fine exceeding $250,000. See U.S.S.G. §5E1.2(c)(4). Money laundering in violation of §1957 is such a statute, as the Sentencing Commission recognized. See U.S.S.G. §5E1.2 Application Note 5. Section 1957(b)(2) authorizes a fine "of not more than twice the amount of the criminally derived property involved in the transaction." This governs whether the offense is money laundering or conspiracy to commit money laundering, for the conspiracy statute provides: "Any person who conspires to commit any offense defined in this section or section 1957 shall be sub-

ject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy." 18 U.S.C. §1956(h). One of the counts on which Tedder has been convicted entailed conspiring to launder $280,070 in proceeds, and another entailed the substantive offense of laundering $250,000. Doubling these produces a statutory maximum high enough to authorize the fine, without needing to consider the $250,000 maximum fines available on the other counts.

Tedder submits that adding the caps from the two counts is a form of double counting, but we do not see why. He does not contend that the counts are multiplicitous or that cumulative punishment is inappropriate under *Blockburger v. United States*, 284 U.S. 299 (1932). Conspiracy and the completed offense are separate crimes. That all money laundering counts were grouped under §3D1.1 for the purpose of determining Tedder's offense level (and thus his imprisonment) is irrelevant. Although the fine table normally links the fine to the offense level, §5E1.2(c)(4) breaks that linkage whenever a statute authorizes a fine exceeding $250,000. See *United States v. Ming Hong*, 242 F.3d 528, 533 (4th Cir. 2001). The grouping rules therefore do not constrain Tedder's fine. Both the statutes and the guidelines authorized the judge to proceed as she did.

The jury determined that Tedder had received funds that are subject to forfeiture under 18 U.S.C. §982, and it liquidated the forfeitable proceeds at about $7.3 million. Later the district judge concluded that errors in the instructions had led the jury to miscalculate, and she reduced the forfeiture to roughly $2.8 million. About $1.7 million of this comes from funds held by Challenge Realty, one of the vessels that Tedder had created to hold the venture's profits, and the rest stands as a personal money judgment against Tedder to be satisfied out of assets that he had purchased with the tainted proceeds. See *United States v. Ginsburg*, 773 F.2d 798 (7th Cir. 1985) (en banc) (discussing tracing

and substituted assets in the law of forfeiture). Tedder insists that the alteration of the jury's award deprived him of his right to a jury trial, but the sixth amendment does not apply to forfeitures. See *Libretti v. United States*, 516 U.S. 29, 49 (1995); *United States v. Vera*, 278 F.3d 672 (7th Cir. 2002). (There is no statutory maximum forfeiture, so *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its successors, including *United States v. Booker*, 125 S. Ct. 738 (2005), do not alter this conclusion. See *United States v. Swanson*, 394 F.3d 520, 526 (7th Cir. 2005); *United States v. Messino*, 382 F.3d 704, 713 (7th Cir. 2004).)

Although Fed. R. Crim. P. 32.2 offers the defendant a jury trial, this provision (unlike the sixth amendment) is limited to the nexus between the funds and the crime; Rule 32.2 does not entitle the accused to a jury's decision on the amount of the forfeiture. Even if it did, the rule would not foreclose what amounts to summary judgment or remittitur; as those procedures are compatible with the seventh amendment's jury-trial right in civil cases, see *Fidelity & Deposit Co. v. United States*, 187 U.S. 315, 319-21 (1902); *Arkansas Valley Land & Cattle Co. v. Mann*, 130 U.S. 69 (1889), they must be compatible with a jury-trial right that rests on a rule of procedure alone. Thus the judge has the power to reduce the jury's excessive award without offering Tedder a new trial—but the final award still must find support in the preponderance of the evidence.

According to Tedder the forfeiture is untenable because he is jointly and severally liable with Pede and D'Ambrosia, who agreed to forfeit more than $3 million as part of their own criminal punishment. Credit that against what Tedder owes and the balance is zero. The district court thought otherwise because the forfeiture ordered against Pede and D'Ambrosia rests on the Racketeer Influenced and Corrupt Organizations Act rather than on the money laundering statutes. That's not a sufficient reason, if Pede and D'Ambrosia already have coughed up the full profits of the venture. For-

feiture reaches proceeds themselves and any traceable substitute assets. 18 U.S.C. §853(p)(2), §982(b)(1). It differs in this respect from a fine. If the United States already has all of the boodle, having collected it from Pede and D'Ambrosia, then the funds in Tedder's hands (or Colonial Realty's accounts) cannot also be traceable proceeds.

But if Pede and D'Ambrosia have surrendered all of the venture's profits, as Tedder insists, what does the $1.7 million in the Colonial Realty account represent? Both the jury and the district judge concluded that it is gambling proceeds that Tedder had squirreled away, and he does not now argue that this finding is inadequately supported. And if Pede and D'Ambrosia have disgorged all of the venture's profits, how could Tedder himself hold $1.1 million that, the judge found, is traceable to gambling profits? The district judge's concrete findings establish that the $2.8 million forfeited in this prosecution is distinct from the assets that Pede and D'Ambrosia have surrendered. The judge rejected the prosecutor's argument that funds passed from Pede or D'Ambrosia to Tedder could be forfeited twice (this was the flaw in the jury's award); the $2.8 million represents only proceeds that came to rest with Tedder or one of the entities he controls. There is no reason to disturb the district judge's disposition of the forfeiture question.

The sentence of 60 months' imprisonment is near the high end of a range (51 to 63 months) that the Guidelines prescribe for someone with offense level 24 and criminal history category I, where the district judge placed Tedder. Three of the offense levels are contested. The district judge added two under U.S.S.G. §2S1.1(b)(2)(B) because Tedder had been convicted under §1956, which forbids conspiracy to commit money laundering. This is one level more than §2S1.1(b)(2)(A) prescribes for someone convicted under §1957, the substantive laundering offense. Tedder contends that he should have been treated as a substantive offender under

§2S1.1(b)(2)(A). And if he prevails on that issue two more levels must be deducted. Guideline 2S1.1(b)(3) adds two levels if the laundering was sophisticated (as the district judge found) *and* the increase under subsection (b)(2)(B) also has been applied. Knock out the extra level from subsection (b)(2)(B), and two levels from subsection (b)(3) go as well. Then Tedder's offense level would be 21 and the guideline range would be 37 to 46 months' imprisonment.

Avoiding the application of subsection (b)(2)(B) seems hard to do, because Tedder *has* been convicted of conspiracy to commit money laundering, and subsection (b)(2)(B) therefore applies according to its terms. But did the Sentencing Commission really prescribe a two-level increase for all who conspire to launder criminal proceeds? Application Note 3(C) to §2S1.1 reads: "<u>Non-Applicability of Enhancement.</u>— Subsection (b)(2)(B) shall not apply if the defendant was convicted of a conspiracy under 18 U.S.C. §1956(h) and the sole object of that conspiracy was to commit an offense set forth in 18 U.S.C. §1957." That describes Tedder's situation precisely: he has been convicted under §1956(h), and the sole object of that conspiracy was the substantive offense specified in §1957.

Declining to apply Application Note 3(C), the district judge deemed it limited to cases in which the base offense level is unrelated to any other crime. How the district judge reached this conclusion requires a bit of background.

Guideline 2S1.1(a) specifies the base offense level. Here it is:

> (1) The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of §1B1.3 (Relevant Conduct)); and (B) the offense level for that offense can be determined; or

(2) **8** plus the number of offense levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds, otherwise.

Application Notes 2 and 3 correspond to subsections (a)(1) and (a)(2). To provide context, we reproduce them in full:

2. <u>Application of Subsection (a)(1).</u>—

(A) <u>Multiple Underlying Offenses.</u>—In cases in which subsection (a)(1) applies and there is more than one underlying offense, the offense level for the underlying offense is to be determined under the procedures set forth in Application Note 3 of the Commentary to §1B1.5 (Interpretation of References to Other Offense Guidelines).

(B) <u>Defendants Accountable for Underlying Offense.</u>—In order for subsection (a)(1) to apply, the defendant must have committed the underlying offense or be accountable for the underlying offense under §1B1.3(a)(1)(A). The fact that the defendant was involved in laundering criminally derived funds after the commission of the underlying offense, without additional involvement in the underlying offense, does not establish that the defendant committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused the underlying offense.

(C) <u>Application of Chapter Three Adjustments.</u>—Notwithstanding §1B1.5(c), in cases in which subsection (a)(1) applies, application of any Chapter Three adjustment shall be determined based on the offense covered by this guideline (i.e., the laundering of criminally derived funds) and not on the underlying offense from which the laundered funds were derived.

3. Application of Subsection (a)(2).—

(A) In General.—Subsection (a)(2) applies to any case in which (i) the defendant did not commit the underlying offense; or (ii) the defendant committed the underlying offense (or would be accountable for the underlying offense under §1B1.3(a)(1)(A)), but the offense level for the underlying offense is impossible or impracticable to determine.

(B) Commingled Funds.—In a case in which a transaction, financial transaction, monetary transaction, transportation, transfer, or transmission results in the commingling of legitimately derived funds with criminally derived funds, the value of the laundered funds, for purposes of subsection (a)(2), is the amount of the criminally derived funds, not the total amount of the commingled funds, if the defendant provides sufficient information to determine the amount of criminally derived funds without unduly complicating or prolonging the sentencing process. If the amount of the criminally derived funds is difficult or impracticable to determine, the value of the laundered funds, for purposes of subsection (a)(2), is the total amount of the commingled funds.

(C) Non-Applicability of Enhancement.—Subsection (b)(2)(B) shall not apply if the defendant was convicted of a conspiracy under 18 U.S.C. §1956(h) and the sole object of that conspiracy was to commit an offense set forth in 18 U.S.C. §1957.

The district judge concluded that because Application Note 3(C) is under the caption "Application of Subsection (a)(2)" it governs only when the base offense level derives from that subsection. Tedder's funds came from a gambling

offense, so subsection (a)(1) furnished the base offense level even though, according to the indictment, the sole object of the §1956(h) conspiracy was a violation of §1957. That meant, the district court concluded, that Application Note 3(C) dropped out of the picture, because subsection (a)(2) had not been used to generate the base offense level.

The problem is that the substance of Application Note 3(C)—the rule that the two-level enhancement under subsection (b)(2)(B) does not apply if the "sole object of [the charged] conspiracy" is money laundering—includes some prosecutions that lead to the use of subsection (a)(1) as well as all prosecutions in which resort to the fallback subsection (a)(2) is required. It is hard to imagine why application of the rule in Note 3(C) should turn on which subdivision of subsection (a) was used to derive the base offense level: the United States offers no reason in its appellate brief, and the Sentencing Commission was silent on the subject. The other five sub-parts of Application Notes 2 and 3 explicitly refer to subsection (a)(1) or (a)(2); Note 3(C) alone does not, and its text suggests a more general application. It is hard to resist the feeling that someone hit the tab key and produced an indent (and hence a subsection (C)) when a new Application Note under its own heading would have been called for.

Our job is to interpret and apply the enacted rules rather than to improve on them. But interpretation covers only the rules' text. Titles, headings, and captions may help disambiguate adopted texts, but they are not themselves rules of law. See, e.g., *INS v. St. Cyr*, 533 U.S. 289, 308-09 (2001); *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998). The text of Application Note 3(C) is unambiguous and covers Tedder's situation; consideration of its heading not only would not help us to understand the language but also would defeat its evident purport. We read Application Note 3(C) to say that the Sentencing Commission has decided *not* to use whatever leeway it possesses to prescribe different penalties for money laundering and

money-laundering conspiracies, but instead wants courts to impose the same punishment for these two offenses. (We say "whatever" leeway advisedly. Section 1956(h) provides that money-laundering conspirators are "subject to" the same sentence as those who commit the substantive offense, and our reading of the Note 3(C) means that we need not decide whether "subject to" just incorporates a maximum penalty from elsewhere or instead means that conspirators must receive the same sentence as those who complete the crime. Cf. *United States v. Haehle*, 227 F.3d 857, 862 (7th Cir. 2000); *United States v. Monem*, 104 F.3d 905, 907-08 (7th Cir. 1997).) Throughout the Sentencing Guidelines inchoate offenses either are treated identically to the corresponding substantive crimes, or are treated as less serious. See U.S.S.G. §2X1.1. To repeat, the prosecutor does not contend that the Sentencing Commission made a specific decision to depart from that norm for §1956(h), or that it would have had any reason to do so. So Application Note 3(C) applies, which leads to an offense level of 21 rather than 24 for Tedder.

Whether this conclusion will benefit Tedder in the end is a question for the district judge. *Booker* provides district judges with additional discretion, so on remand the judge might reimpose the 60-month sentence if she thinks it the most appropriate response to Tedder's crimes and risks of recidivism; appellate review after *Booker* is for reasonableness. But our holding makes the range of 37 to 46 months' imprisonment available without any need to justify departure from the Guidelines.

The judgment is affirmed except with respect to the term of imprisonment. That aspect of the judgment is vacated, and the case is remanded with instructions to resentence Tedder in light of *Booker* and this opinion.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*