# United States Court of Appeals
## For the First Circuit

No. 22-1864

UNITED STATES OF AMERICA,

Appellee,

v.

HASSAN ABBAS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Kayatta, Lynch, and Gelpí,
Circuit Judges.

James M. Mason, with whom Handelman & Mason LLC was on brief,
for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom
Joshua S. Levy, Acting United States Attorney, was on brief, for
appellee.

April 29, 2024

**GELPÍ**, **Circuit Judge**.  Hassan Abbas ("Abbas") was convicted in the United States District Court for the District of Massachusetts on several wire-fraud and money-laundering-related charges.  For six days, a jury heard evidence connecting Abbas to an email-based fraud scheme that, in part, targeted citizens of the Commonwealth of Massachusetts.  He launches several challenges on appeal, including whether Massachusetts was the proper venue.

We affirm Abbas's convictions for wire fraud under Counts One and Two and money laundering conspiracy (Count Six (B)), including rejecting his challenges as to venue, sufficiency of the evidence, and the admissibility of certain evidence.  As to his money-laundering/unlawful-transactions convictions in Counts Three, Four, and Five, we vacate those convictions, without prejudice.  We do so because under the venue provisions of 18 U.S.C. § 1956 (i)(1)(B), the statute as to which the jury was instructed at the request of the government, venue did not lie in Massachusetts.  We do not reach the government's alternate argument that venue was proper under 18 U.S.C. § 1956(i)(3), as the jury was not so instructed.  Accordingly, we vacate and remand for resentencing and recalculation of the restitution.

## I. Background

"When recounting the evidence relevant to [Abbas's] sufficiency-of-the-evidence challenges, we take the facts in the light most favorable to the verdict. For the other issues on appeal, we present the facts in a balanced way, taking an objective view of the evidence in the record." United States v. Facteau, 89 F.4th 1, 16 (1st Cir. 2023) (cleaned up) (internal quotations and citations omitted).

The second superseding indictment was the basis of the trial and charged Abbas for his role in facilitating two types of fraudulent schemes: (1) "romance scams" and (2) "Business Email Compromises". In romance scams, scammers typically create a fake online dating profile, use it to woo their victims and earn their victims' trust, and then convince the victims to wire funds to the scammer under false pretenses. Business Email Compromises, on the other hand, target parties that send wire transfers as part of a legitimate financial transaction, sending email messages that appear to come from a participant in that legitimate transaction. In reality, the request is from a "spoofed" email address -- one that looks like the email address of a participant in the transaction but has a subtle flaw, such as a missing letter -- with which the scammer swindles the funds away from the victim. As FBI Special Agent Kelly Bell ("Special Agent Bell") testified at trial, for both types of schemes "the money goes to a network of money

launderers, instead of where the person who sent the funds expects them to go."

## A. Abbas's Involvement

Abbas is a dual citizen of Belgium and Lebanon, who resided in the United States at the time of his arrest. He earned his law degree in 1991 from DePaul University and practiced from his law office in Chicago, Illinois. Abbas formed several legal entities on the following dates: (1) Midamines Sprl, Ltd. ("Midamines") on September 26, 2012; (2) Phoenicia Trust, Ltd. ("Phoenicia") on July 7, 2017; (3) Katchi, Inc. ("Katchi") on November 29, 2017; (4) Sparta Gijon, Inc., ("Sparta") on December 11, 2017; (5) Sarah Eshel, Inc., on January 27, 2018; and (6) EPMinerals LLC, on January 29, 2018. Abbas set up bank accounts respectively for each entity shortly after its creation, listed himself as the sole corporate official on the relevant corporate forms, and, aside from Sparta, listed his home or office address in Chicago as the corporate address.

For example, Abbas opened a PNC Bank account in Illinois[1] for Phoenicia on July 10, 2017, just three days after Abbas incorporated the entity. Phoenicia was incorporated and located in Illinois. And Abbas opened a U.S. Bank account for Sparta on

_____

[1] PNC Bank is located in Cleveland, Ohio, but Abbas accessed Phoenicia's account from Illinois and testimony at trial established that the address listed on the account was in Illinois.

- 4 -

January 31, 2018. Sparta's account, corporate address, and state of incorporation were listed in California. Abbas was the sole authorized signer for both Phoenicia and Sparta's bank accounts.

The accounts associated with the several corporate entities, including Sparta and Phoenicia, engaged in transactions that the government's witnesses described as unusual and not indicative of regular business activity. For instance, Katchi's checking account with First Midwest Bank remained at a negative balance for months after Abbas withdrew a large sum from the account and wired most of the money into his personal account. Abbas likewise opened Sparta's U.S. Bank account with a $225,000 check from Phoenicia; wired the majority of that money to another company; left the account "stagnant" from February of 2018 until October of 2018; received over $392,000 on December 11, 2018; and then moved $389,750 to his personal accounts, accounts that he controlled, and other accounts overseas. The entities Abbas created, including Sparta and Phoenicia, did not file tax returns for 2017 or 2018 with the IRS, and evidence at trial revealed that the entities did not issue 1099s or W2s to any individuals.

## B. Fraudulent Conduct

### i. Business Email Compromises

Maclover Linhares ("Linhares"), a resident of Massachusetts, and his wife looked to buy their first house in Marlborough, Massachusetts, in August of 2017. Linhares received

- 5 -

a spoofed email purporting to be from a lawyer requesting Linhares to wire funds to close on the Marlborough house. Linhares wired $30,427 from his account in Massachusetts on August 22, 2017 to Phoenicia's PNC account in Illinois. The next day, Linhares discovered that he was conned out of that money.

Other homebuyers fell prey to spoofed emails associated with Abbas's entities. In June of 2017, Antonio Gatto ("Gatto") was in the process of buying a house in Washington state. He received a spoofed email purporting to be from his real estate agent on June 7, instructing him to submit $80,000 to Midamines's JP Morgan Chase bank account in Illinois. He did so, not recognizing until the next day that he was a victim of fraud. Two other potential homebuyers, Judy Lambert ("Lambert") and Stan Hockerson ("Hockerson"), also became victims. They wired around $131,000 and $71,000 from Florida and New Mexico, respectively, in August of 2017 to Phoenicia's PNC account in Illinois after spoofed emails instructed them to do so to close on homes that they wanted to buy.

Corporations were also not spared from fraud. Conquest Properties, LLC, ("Conquest") in Utah wired $507,500 to Midamines's Bank of America account in Illinois after receiving a spoofed email from a title company that the corporation worked with. And Paulson-Cheek Mechanical, Inc. ("Paulson-Cheek") in Georgia wired $256,837.47 on February 8, 2018, to Katchi's First

Midwest account in Illinois in response to an email purporting to be from an air-conditioning equipment supplier that Paulson-Cheek worked with.

By timely informing their financial institutions and law enforcement, Conquest and Linhares received the funds they wired back in full.  And Lambert, Hockerson, and Paulson-Cheek received back most of what they wired.  But Gatto lost the $80,000 he sent to Midamines.

### ii. Romance scams

Evelyn Fessenden ("Fessenden"), a retiree living in Marblehead, Massachusetts, joined the dating website Match.com in November of 2018.  A profile named "James Deere" -- purporting to be a widower in Massachusetts -- contacted her on Match.com.  Deere communicated with Fessenden romantically via email and telephone for a few weeks, and then requested money from her that would purportedly allow him to receive funds from Dubai in relation to his work as a consultant.  Fessenden, in response, wired $100,000 on December 12, 2018 and $11,000 on December 14, 2018 from her bank account in Massachusetts to Sparta's U.S. Bank account in

California. But in reality, Deere was Kenneth Chukwuemeka Ikedi of Nigeria, who used the fake profile for romance scams.[2]

Fabyan Pierro ("Pierro"), a retiree in New York, responded to a message on Facebook from someone purporting to be "Wilson Brown," an Army general. They developed a relationship over the internet. Brown asked Pierro for "emergency" help in leaving Syria, and another Facebook profile -- purporting to be "General Zack Philip" -- sent her messages inducing her to deposit $60,000 on December 4, 2017 into Phoenicia's account with Citibank in Illinois to assist Brown.

Fessenden and Pierro inevitably discovered that they were the victims of fraud. But neither ever retrieved the funds that they wired to Sparta or Phoenicia. And neither knew nor ever had any contact with Abbas.

## C. Flow of Funds and Investigation

At trial, Joe Vavruska, an investigator from PNC Bank, testified about Abbas's maneuvers upon receiving money from Linhares. Abbas withdrew around $8,000 from Phoenicia via ATMs the day after Linhares wired the money. He then wired $7,500 from

---

[2] The government did not introduce direct evidence proving that Ikedi and Abbas contacted one another. However, construing the evidence in the light most favorable to the verdict, the jury could conclude that they coordinated with each other. After all, Ikedi instructed Fessenden to forward the money to Sparta, and trial testimony established how participants in these schemes generally communicate through encrypted messages unavailable to law enforcement.

Phoenicia's PNC account in Illinois to his personal PNC account in Illinois on August 25, 2017.

John Harger ("Harger"), a forensic accountant with the FBI, also testified that on December 13, 2018, the day after Fessenden wired $100,000 to Sparta, Abbas wired $82,500 from Sparta's U.S. Bank account in California to an account belonging to TCL Air Conditioner in China. Harger also testified how two transfers of $39,200 each went from Sparta's U.S. Bank account in California to Abbas's personal bank account at TD Bank in Illinois on December 14, 2018. Harger further testified that Abbas sent more funds from Sparta's U.S. Bank account in California to his personal account in Illinois and overseas accounts on the same day that Fessenden wired the $11,000.

The government's witnesses painted Abbas's behavior as a pattern. Harger described how Abbas set up the accounts with small initial deposits often a few days before the victims wired funds; how he frequently withdrew funds for personal expenses; and how those funds were spread out and redistributed across other accounts -- some to accounts in Abbas's name, others for entities he created, or to entities set up in his daughter's name -- almost immediately after the victims wired money. Special Agent Bell testified that this pattern was common among perpetrators of romance scams and Business Email Compromises. She noted that the money moves quickly because victims often recognize "that their

- 9 -

money was sent elsewhere," so they notify their banks quickly to "either freeze those funds or even pull back a wire that's initiated." Generally, fraudsters transfer that money across multiple accounts to prevent that from happening.

Because most of the victims suspected fraud and informed law enforcement and their financial institutions, the banks began investigating further. To that end, representatives from these banks contacted Abbas about this activity and placed holds on his accounts when he attempted to transfer these funds.

For instance, after Abbas wired $7,500 from Phoenicia in Illinois to his personal account also in Illinois on August 25, 2017, Abbas attempted to wire money from Phoenicia that same day to a Chinese company. PNC Bank placed a hold on this transfer, and one of its investigators contacted Abbas. Abbas explained that this transfer was to purchase electronics in China. PNC Bank's investigator likewise asked Abbas about the other wires into Phoenicia's account -- including from Linhares and Lambert -- and Abbas explained that this money was "for selling bonds." The bank closed the account because of suspicious activity.

## D. Procedural History

A federal grand jury indicted Abbas on January 21, 2020. A second superseding indictment ultimately charged him with six counts:

- Count One: Wire Fraud, 18 U.S.C. § 1343, for the $30,427 transfer from Linhares in Massachusetts to Phoenicia in Illinois on August 22, 2017;

- Count Two: Wire Fraud, 18 U.S.C. § 1343, for the $100,000 transfer from Fessenden in Massachusetts to Sparta in California on December 12, 2018;

- Count Three: Money Laundering, 18 U.S.C. § 1956(a)(1)(B)(i), related to the $7,500 transfer from the Phoenicia PNC account in Illinois to Abbas's personal PNC account in Illinois on August 25, 2017;

- Count Four: Unlawful Monetary Transactions, 18 U.S.C. § 1957, related to the $82,500 transfer from Sparta's U.S. Bank account in California to TCL Air Conditioner in China on December 13, 2018;

- Count Five: Unlawful Monetary Transactions, 18 U.S.C. § 1957, related to one of the $39,200 transfers from Sparta's U.S. Bank account in California to Abbas's personal TD account in Illinois on December 14, 2018; and

- Count Six: Money Laundering Conspiracy, 18 U.S.C. § 1956(h), related to conspiring to commit (A) concealment money laundering, as alleged in Count Three, and (B) unlawful monetary transactions, as charged in Counts Four and Five.

Abbas first challenged venue on Counts Three through Five at the motion-to-dismiss stage. Abbas argued that Count Three concerned a transfer of proceeds of wire fraud between two Illinois bank accounts, while Counts Four and Five were transfers from a California bank account to China and Illinois, so he contended

- 11 -

that venue did not lie in Massachusetts. The district court turned to the relevant venue provision, 18 U.S.C. § 1956(i). With the government's prompting, the district court focused on § 1956(i)(1)(B), which provides venue in "any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted." Section 1956(c)(9) further defines "proceeds" as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity."

Abbas argued that the money derived from Linhares and Fessenden was not "proceeds" of wire fraud until within his possession and control. The district court denied the motion because it determined the issue of when the wired funds became "proceeds" "raise[d] a number of questions not capable of resolution" before trial. In doing so, the district court considered (1) the principle that concealment-money-laundering prosecutions not be premised on transactions that create proceeds, but on the posterior conduct in concealing those proceeds, and (2) how § 1956 defined "proceeds", which the district court reasoned could permit a jury to conclude that "at the moment the victim initiated the wire transfer in Massachusetts, the victim

may have transformed the funds into 'property derived from' or 'gross receipts' of the specified unlawful activity, or the defendant may have otherwise 'obtained' the funds at the moment."

During trial, Abbas sought to introduce testimony from Jon Boudreau ("Boudreau"), an employee of the Federal Reserve Bank of Boston. Abbas offered Boudreau to support his theory that the wire-fraud charges lacked venue in Massachusetts and that the transfers did not impact interstate commerce. Boudreau would have testified that when a transferor initiates a wire transfer, an instruction is sent from the transferor to a Federal Reserve processing center. The processing center, upon receiving the instruction to transfer funds, then processes the request and debits and credits funds to the sender and recipient's respective accounts. Boudreau would have testified that when Linhares and Fessenden initiated the wire transfers from Massachusetts, they really sent instructions from Massachusetts to the Federal Reserve processing center in Texas. The Texas center then transferred the funds to Abbas's account with PNC Bank. The district court excluded that testimony. It reasoned that the testimony "tend[ed] to show" that a wire originated in Massachusetts, so it was irrelevant to Abbas's theory that venue did not lie in Massachusetts for wire fraud.

Abbas submitted proposed jury instructions. He wanted the jury to be instructed that it must "determine whether the

single overall conspiracy charged in the indictment existed, or if multiple conspiracies existed, or none at all" because this was "a question of fact for . . . the jury, to determine in accordance with [the district court's] instructions." Abbas also requested that the district court instruct the jury that "[w]ired funds do not become proceeds until credited to the account of the beneficiary and under [the] defendant's control."

The district court instructed the jury that it could find venue under § 1956(i)(1)(B) for Counts Three through Five if the government proved by a preponderance of the evidence that "Abbas participated in the transfer of this specified unlawful activity (here, wire fraud) from Massachusetts to the district where the financial or monetary transaction is conducted." The district court defined "proceeds" as "any profits or gross receipts that someone acquires or retains as a result of the commission of the unlawful activity." Turning to conspiracy, the district court instructed the jury that "[w]hether there was a single conspiracy, . . . multiple conspiracies or no conspiracy at all is a question of fact for you, the jury, to determine in accordance with my instructions to you."

Once he heard the proposed instructions, Abbas "specifically" objected to the district court's refusal to give his "proposed instruction regarding venue," his "instruction regarding good faith," and his "instruction regarding reliance on

representations of clients." He finally objected to the district court's refusal to give "his proposed instruction regarding when funds become proceeds."

The jury convicted Abbas on Counts One through Five and Six (B).

Abbas renewed his Rule 29 motion, including on venue grounds, after the verdict. He again argued that the money sent from Linhares and Fessenden did not become "proceeds" until in his possession in Illinois and California. In opposing, the government noted "that 'proceeds' may be derived from a completed offense or a completed phase of an ongoing offense," so the jury could conclude that the wired funds became proceeds once the victims were successfully induced to part with their money -- even before the funds arrived in Abbas's accounts by wire. The government also pointed to § 1956(i)(3):

> For purposes of this section, a transfer of funds from 1 place to another, by wire or any other means, shall constitute a single, continuing transaction. Any person who conducts (as that term is defined in subsection (c)(2)) any portion of the transaction may be charged in any district in which the transaction takes place.

18 U.S.C. § 1956(i)(3). Section 1956(c)(2) defines "conducts" to "include[] initiating, concluding, or participating in initiating, or concluding a transaction." By the government's reading of § 1956(i)(3), Abbas "conducted a portion of a single, continuing

- 15 -

transaction with [the] proceeds" of wire fraud "by receiving them into his bank account."  Because "[t]hat single, continuing transaction originated in Massachusetts," the government argued, Abbas could be prosecuted there.

The government did not raise § 1956(i)(3) at any point before its response in opposition to Abbas's renewed Rule 29 motion.  Rather, the government submitted the very instruction on venue that the district court adopted, which tracked § 1956(i)(1)(B).

The district court agreed with the government's reading of § 1956(i)(1)(B) and denied Abbas's post-trial Rule 29 motion. It found that "the jury could have reasonably concluded that the funds" sent in the underlying wire-fraud charges from Massachusetts to Illinois and California "were transformed into 'property derived from' or 'gross receipts' of unlawful activity." Due to this conclusion, the district court refused to address the government's alternative theory of venue under § 1956(i)(3).

The district court sentenced Abbas to 108 months' imprisonment,[3] followed by three years' supervised release, and ordered him to pay $2,001,853.68 in restitution.

---

[3] The district court imposed "108 months on each of the six counts . . . to be served concurrently with each other."

## II. Discussion

Because Abbas conglomerates his sufficiency-of-the-evidence and venue challenges, we consider them seriatim as needed. We discuss the remaining issues afterwards.

Abbas moved for acquittal at the close of the government's case, and he renewed this motion at the appropriate time. Thus, our review is de novo. See United States v. Buoi, 84 F.4th 31, 37 (1st Cir. 2023). For a sufficiency challenge, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Falcón-Nieves, 79 F.4th 116, 123 (1st Cir. 2023) (emphasis deleted) (quoting United States v. Woodward, 149 F.3d 46, 56 (1st Cir. 1998)); see also United States v. Ayewoh, 627 F.3d 914, 917 (1st Cir. 2010). "We may uphold a conviction against a sufficiency challenge on the basis of circumstantial evidence, though we may not pursue a divide and conquer strategy in considering whether the circumstantial evidence [in the record] adds up" or "stack inference upon inference in order to uphold the jury's verdict." United States v. Ramos-Baez, 86 F.4th 28, 48 (1st Cir. 2023) (alteration in original) (quoting United States v. Guzman-Ortiz, 975 F.3d 43, 55 (1st Cir. 2020)).

Abbas also preserved his venue objection. The Constitution as well as Federal Rule of Criminal Procedure 18 require the government to try Abbas in the venue "wherein the crime [was] committed." U.S. Const. amend. VI; Fed. R. Crim. P. 18. "If the statute under which the defendant is charged contains a specific venue provision, that provision must be honored (assuming, of course, that it satisfies the constitutional minima)." United States v. Salinas, 373 F.3d 161, 164 (1st Cir. 2004); see United States v. Seward, 967 F.3d 57, 60 (1st Cir. 2020). "Where a venue determination has been made by a jury, as happened here, 'we will uphold the verdict if a rational juror could have found proper venue by a preponderance of the evidence.'" United States v. Georgiadis, 819 F.3d 4, 11 (1st Cir. 2016) (cleaned up) (quoting United States v. Joselyn, 99 F.3d 1182, 1190 (1st Cir. 1996)).

We resolve all credibility issues and draw all reasonable inferences in the light most favorable to the verdict for Abbas's venue and sufficiency challenges. See id.; Ramos-Baez, 86 F.4th at 48.

## A. Wire Fraud (Counts One and Two)

### i. Sufficiency of the Wire Fraud Evidence

For his wire fraud convictions, Abbas contends that there was insufficient evidence of his involvement in the scheme or intent to defraud. As he puts it, the witnesses testified that

- 18 -

they never communicated with him, did not know him, and did not know specifically who defrauded them. He argues that without evidence to directly tie him to the fraud scheme, the jury could not infer his intent or involvement in the scheme beyond a reasonable doubt.

"Wire fraud has three elements: '1) a scheme to defraud by means of false pretenses, 2) the defendant's knowing and willful participation in the scheme with the intent to defraud, and 3) the use of interstate wire communications in furtherance of the scheme.'" Buoi, 84 F.4th at 38 (quoting United States v. Cassiere, 4 F.3d 1006, 1011 (1st Cir. 1993)). "[D]irect proof of knowledge is not required. 'The government's proof may [lie] entirely in circumstantial evidence.'" United States v. Ford, 821 F.3d 63, 75 (1st Cir. 2016) (cleaned up) (quoting United States v. Valerio, 48 F.3d 58, 63 (1st Cir. 1995)).

Viewing the evidence in the light most favorable to the verdict and as a whole, there was abundant evidence from which a reasonable jury could conclude that Abbas acted with the intent to defraud. The government introduced evidence that Abbas set up and controlled the bank accounts that received the money. The jury could reasonably conclude that Abbas gave his coconspirators his account information and knew he would receive that money. See, e.g., United States v. Pena, 910 F.3d 591, 596-97 (1st Cir. 2018) (affirming wire-fraud conviction where the government introduced

- 19 -

evidence, in part, proving that the defendant received deposits from the victims and facilitated the transfer of those funds); United States v. Appolon, 695 F.3d 44, 59 (1st Cir. 2012) (affirming wire-fraud conviction where the defendant was not a direct participant in the individual fraudulent acts but received payments because of the fraud and was "tied" to the scheme).

The government also introduced evidence that undermined Abbas's explanations to fraud investigators. Although Abbas told investigators that he received the money from the sale of bonds and to purchase electronics, the jury heard how Linhares and Fessenden did not know Abbas; how they wired the money to Abbas's accounts under the misconception that they were going to purchase a house and help "James Deere," respectively; and how they discovered that the emails were spoofed. The jury could thus conclude that his "implausible" excuses betrayed his knowledge of the fraudulent scheme. United States v. Gorski, 880 F.3d 27, 33 (1st Cir. 2018) (quoting United States v. Serrano, 870 F.2d 1, 7 (1st Cir. 1989)).

Moreover, the government showed that Abbas's actions bore the hallmarks of Business Email Compromises and romance scams. He set up the entities and accounts which received the money, received that money shortly thereafter from the victims, and immediately transferred that money to himself or overseas accounts. The timing of these transactions did not do Abbas any

favors. Cf. United States v. Agbi, 84 F.4th 702, 709 (7th Cir. 2023) (crediting the jury's inference that the defendant conspired to commit mail fraud by romance scam based on his prompt transfer of fraudulent funds to overseas accounts). For example, Abbas set up Phoenicia's PNC account shortly before receiving the wire transfers from Linhares, Lambert, and Hockerson. And the jury heard how Abbas and his entities did not engage in ordinary business activity, instead keeping the accounts dormant over many months until acting only to receive and transfer the Business-Email-Compromise-and-romance-scam funds. Thus, a reasonable jury could conclude that Abbas actively and knowingly participated in the fraud scheme.

That the victims did not know or communicate with Abbas does not help him. "[T]here is no requirement under § 1343 that a defendant know the actual identities of the victims of the fraudulent scheme for there to be sufficient evidence that the defendant knowingly and willfully participated in perpetrating the scheme." Pena, 910 F.3d at 598 (citing United States v. Tum, 707 F.3d 68, 75 (1st Cir. 2013)). And, to the extent that Abbas argues that this should have led the jury to conclude that he was not an active participant in the scheme, "the jury was entitled to come to whatever rational conclusion it saw fit based on the evidence" before it. Buoi, 84 F.4th at 38 (citing United States v. Soler-Montalvo, 44 F.4th 1, 8 (1st Cir. 2022)).

He further argues that the government did not present enough evidence of a causal connection between his actions and the victims' losses. In this vein, he downplays his role and claims that merely setting up the accounts did not prove that he induced the victims to wire the money or that it was foreseeable that they would do so.

Abbas misapprehends the level of participation or foreseeability required to be guilty of wire fraud. The government need only have proved that the use of a wire "was a reasonably foreseeable part of the scheme in which [Abbas] participated." Tum, 707 F.3d at 72 (quoting Woodward, 149 F.3d at 63); see United States v. Fermín Castillo, 829 F.2d 1194, 1198-99 (1st Cir. 1987). The jury could infer that the victims sent the money to Abbas because he forwarded his account information to his coconspirators, so it could conclude that Abbas, the account holder, would foresee wires to his account. It makes no difference that his co-conspirators "did all the heavy lifting" by sending the emails. United States v. DiRosa, 761 F.3d 144, 151 (1st Cir. 2014) (affirming wire-fraud conviction where the defendant did not personally induce the wire transactions but played a pivotal role in the scheme). Abbas facilitated wire fraud by creating the accounts that the money was wired into, so the jury could rationally conclude that he was a knowing participant in the scheme who could reasonably foresee the victims' wires.

### ii. Wire Fraud Venue

Abbas's venue arguments for Counts One and Two largely track his sufficiency arguments. We note from the outset that Abbas and the government agree that United States v. Pace, 314 F.3d 344 (9th Cir. 2002) offers the proper standard for venue in wire-fraud prosecutions. And the district court instructed the jury with this standard in mind. We thus assume this standard applies for this appeal. See United States v. Capelton, 966 F.3d 1, 6-7 (1st Cir. 2020) (assuming for the purposes of the appeal that "generic aiding and abetting liability requires a shared intent with the principal and that knowledge alone is insufficient to meet the mens rea requirement" because the parties "generally agree[d]" that this standard applied). In Pace, the Ninth Circuit determined that the proper venue for a wire-fraud prosecution is wherever "the wire transmission at issue originated, passed through, or was received, or from which it was orchestrated." 314 F.3d at 349 (internal quotation marks omitted). That is because "the essential conduct prohibited by § 1343 [is] the misuse of [the] wires." Id.

Abbas lacks a meritorious challenge to venue under this standard. The wires here "originated" from Massachusetts because Linhares and Fessenden sent them from their banks in Massachusetts. And we have already explained that the jury could piece together his knowing involvement in the scheme based on his control of the

accounts, his flimsy justifications for why he received the money, and how this sequence fits the pattern of Business Email Compromises and romance scams. The jury could thus conclude that Abbas was part of that scheme, that the scheme involved "the misuse of [the] wires" through fraudulent wire transfers, and that these wires "originated" in Massachusetts. Pace, 314 F.3d at 349. Because this means that Massachusetts had a "direct" connection to Abbas's misuse of the wires, it was an appropriate venue for his wire-fraud charges. Id. at 350.

Accordingly, Abbas's convictions on Counts One and Two were supported by sufficient evidence and laid in the proper venue.

## B. Money Laundering and Unlawful Monetary Transactions (Counts Three through Five)

### i. Money Laundering and Unlawful Monetary Transactions Venue

The parties and district court considered whether Abbas could be tried for Counts Three through Five in Massachusetts under § 1956(i), so we consider whether the evidence was sufficient to support venue under that section.[4] To do so, we look to the ordinary tools of statutory interpretation to "ascertain[] the

---

[4] Abbas framed his challenge to venue below on both statutory and constitutional grounds. Other than noting his constitutional right to be tried in the proper venue, however, he does not challenge § 1956(i) as unconstitutional before us on appeal. "[W]e deem abandoned all arguments that have not been briefed and developed on appeal." SEC v. Tambone, 597 F.3d 436, 441 (1st Cir. 2010) (citing United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990)).

meaning of" the statute. Seward, 967 F.3d at 66; see Salinas, 373 F.3d at 164-65. "We begin, as always, with the text of the statute" and read it "according to its 'plain meaning at the time of enactment.'" United States v. Winczuk, 67 F.4th 11, 16 (1st Cir. 2023) (quoting Tanzin v. Tanvir, 592 U.S. 43, 48 (2020)). In doing so, we "must read the words Congress enacted 'in their context and with a view to their place in the overall statutory scheme.'" Turkiye Halk Bankasi A.S. v. United States, 598 U.S. 264, 275 (2023) (quoting Davis v. Mich. Dep't of Treasury, 489 U.S. 803, 809 (1989)). "[O]ur inquiry into the meaning of [a] statute's text ceases when the statutory language is unambiguous and the statutory scheme is coherent and consistent." Matal v. Tam, 582 U.S. 218, 232 (2017) (internal quotation marks and citation omitted).

### a. Section 1956(i)

As a reminder, Abbas was convicted of violating 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957. Section 1956 (a)(1)(B)(i) forbade Abbas, "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity," from "conduct[ing]" that "financial transaction which . . . involve[d] the proceeds of specified unlawful activity" knowing that the transaction was "designed in whole or in part" "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds" of such

unlawful activity. See United States v. Misla-Aldarondo, 478 F.3d 52, 68 (1st Cir. 2007). Section 1957(a) prevented him from "knowingly engag[ing] . . . in a monetary transaction in criminally derived property" exceeding "$10,000 and . . . derived from specified unlawful activity." "Criminally derived property" means "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. §§ 1957(f)(2), (f)(3).

Section 1956(i)(1)(B) provides venue for both §§ 1956(a)(1)(B) and 1957 where "the underlying specified unlawful activity" could be prosecuted, "if [Abbas] participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted." It is not disputed that the "underlying specified unlawful activity" here is wire fraud. And we have explained why the government could prosecute the wire-fraud charges in Massachusetts. So, whether the government could prosecute Abbas for money laundering in Massachusetts turns entirely on whether he "participate[d] in the transfer of the proceeds of [wire fraud] from" Massachusetts to Illinois and California. Id. § 1956(i)(1)(B).

There was sufficient evidence that Abbas "participated" in the underlying scheme. "In common parlance, the word 'participation' means 'taking part with others in an activity.'"

United States v. Patch, 9 F.4th 43, 46 (1st Cir. 2021) (quoting Participation, Webster's Third New Int'l Dictionary (1981)); see also Participation, Black's Law Dictionary (11th ed. 2019). The jury could reasonably conclude that Abbas took part in the scheme by creating the accounts that the money went into and thus facilitating wire fraud.

That Abbas "participated" in the underlying wire transfer, however, does not resolve when the funds that Linhares and Fessenden transferred from Massachusetts became "proceeds" of wire fraud. Abbas argues that this money became proceeds under § 1956(i)(1)(B) only when the money reached his bank accounts within Illinois and/or California. Because he claims that he only transferred the "proceeds" of wire fraud when he moved these funds from Illinois and California, then he did not participate in the transfer of proceeds from Massachusetts. That is why he contends that there was not venue in Massachusetts for Counts Three through Five.

Section 1956(c)(9) defines "proceeds" in the past tense, as "any property derived from or obtained or retained" from "unlawful activity." The ordinary meaning of "retained" means to "keep in possession or use," Retain, Merriam-Webster's Collegiate Dictionary (11th ed. 2020), while "property" implies ownership and possession, Property, Merriam-Webster's Collegiate Dictionary (11th ed. 2020); see, e.g., United States v. Piervinanzi, 23 F.3d

- 27 -

670, 677 (2d Cir. 1994) (analyzing the meaning of "criminally derived property" in § 1957 before Congress amended the statute to add a specific definition for "proceeds"). "Obtain" likewise means "to gain or attain," so these terms connote acquisition and possession.[5]  Obtain, Merriam-Webster's Collegiate Dictionary (11th ed. 2020).  We can infer from the ordinary meaning of these words that a miscreant must possess or control a victim's property before that property can be considered "proceeds." See, e.g., In re Brown, 953 F.3d 617, 623-24 (9th Cir. 2020) (collecting cases which hold that "to show that a defendant 'obtained' proceeds, there must be a demonstration of possession or control").

We have grappled with this question as it relates to the criminal conduct that may be punished as money laundering under § 1956(a)(1).  That is relevant because § 1956(a)(1) punishes a defendant for engaging in a financial transaction that "involves the proceeds of specified unlawful activity" (emphasis added). Cf. United States v. Richard, 234 F.3d 763, 769 (1st Cir. 2000) (looking to how the money-laundering statutes use "proceeds" to determine when "proceeds" are generated).  "We presume that the same term has the same meaning when it occurs here and there in a

_____

[5] See Obtain, Black's Law Dictionary (11th ed. 2019) ("To bring into one's possession[.]"); Property, Black's Law Dictionary (11th ed. 2019) ("[T]he rights in a valued resource . . . includ[ing] the right to possess and use[.]"); Retain, Black's Law Dictionary (11th ed. 2019) ("To hold in possession or under control[.]").

single statute." United States v. Cruz-Rivera, 954 F.3d 410, 413 (1st Cir. 2020) (quoting Envtl. Def. v. Duke Energy Corp., 549 U.S. 561, 574 (2007)). We look then to when "proceeds" are generated under § 1956(a) to afford "proceeds" under § 1956(i) the same meaning. Cf. Armour Packing Co. v. United States, 209 U.S. 56, 73-75 (1908) (considering whether a venue provision authorizing prosecution for the transportation of goods at a rate below the applicable tariffs in any district "through which the transportation may have been conducted" applied by first reviewing how the statute defined the crime to ascertain the extent to which Congress intended to punish the transportation of those goods); United States v. Morales, 801 F.3d 1, 5-6 (1st Cir. 2015) (defining "offense" in a manner that was consistent with how "offense" was defined in a statute concerning the same subject).

When Congress enacted the Money Laundering Control Act of 1986, it "intended to criminalize a broad array of transactions designed to facilitate numerous federal crimes," United States v. Castellini, 392 F.3d 35, 48 (1st Cir. 2004) (quoting United States v. LeBlanc, 24 F.3d 340, 346 (1st Cir. 1994)), and thus to cover any gaps in the law "with respect to the post-crime hiding of ill-gotten gains," LeBlanc, 24 F.3d at 346 (quoting United States v. Johnson, 971 F.2d 562, 569 (10th Cir. 1992)). But these statutes "interdict only the financial transactions" that launder the funds, "not the anterior criminal conduct that yielded the

funds allegedly laundered." United States v. Cabrales, 524 U.S. 1, 7 (1998); see LeBlanc, 24 F.3d at 346.  In other words, "money laundering criminalizes a transaction in proceeds, not the transaction that creates the proceeds." Richard, 234 F.3d at 769 (citing Johnson, 971 F.2d at 570); see also United States v. Huff, 641 F.3d 1228, 1233 (10th Cir. 2011).

This concept is not as rigid as it might seem. "'Proceeds' of an illegal activity may be created before the completion of an underlying on-going crime." Castellini, 392 F.3d at 48 (quoting United States v. Mankarious, 151 F.3d 694, 705 (7th Cir. 1998)).  And the crime creating proceeds and the crime transferring proceeds "need not be 'entirely separate in time.'" Misla-Aldarondo, 478 F.3d at 68 (quoting Castellini, 392 F.3d at 48).  The question is whether "[t]he transaction that created the proceeds . . . is sufficiently distinct from the side transactions done to hide the trail . . . even if both crimes were complete only upon the arrival of the funds in [the defendant's] hands." Id. (distinguishing between extortion and sending checks to aides and relatives to hide the proceeds of extortion); see LeBlanc, 24 F.3d at 346-47 (distinguishing between the generation of illegal gambling money and subsequent laundering of the proceeds of illegal gambling); Mankarious, 151 F.3d at 705-06 (affirming money-laundering conviction predicated on mail fraud because although the defendants used the mail illegally only after the

scheme generated proceeds, the scheme generated proceeds through acts distinct from the laundering).

We relied on this principle in United States v. Richard, 234 F.3d 763 (1st Cir. 2000) to reject a defendant's argument that he could not be prosecuted for money laundering because his bankruptcy fraud was not "complete" and therefore did not yet generate "proceeds." Id. at 769-70. Although "the laundering of funds cannot occur in the same transaction through which those funds first became tainted by crime," id. at 769 (quoting United States v. Butler, 211 F.3d 826, 830 (4th Cir. 2000)), we determined that the bankruptcy fraud reached a "completed phase" and produced "proceeds" when the defendant possessed the property at issue, so the acts of laundering were distinct from the offense that generated the proceeds. Id. at 770.

We distinguished that defendant's situation from the one presented in United States v. Johnson, 971 F.2d 562 (10th Cir. 1992), which Abbas relies upon here. In Johnson, the government prosecuted the defendant for money laundering where the predicate wire fraud transfers were the same transfers that allegedly involved "proceeds" of wire fraud. Id. at 564-65, 569. The Tenth Circuit agreed with the defendant that he could not have engaged in a criminally-derived-property transaction because he did not possess these proceeds until after the wire transfer. Id. at 569-70. The wire fraud and alleged laundering were one and the

- 31 -

same, so there was no transfer of "proceeds" because the wirings of the funds were simply the transactions to obtain those proceeds. Id. We noted in Richard that what matters in this context was "that the predicate offense has produced proceeds in transactions distinct from those transactions allegedly constituting money laundering." Richard, 234 F.3d at 770 (quoting Mankarious, 151 F.3d at 706); see United States v. Morelli, 169 F.3d 798, 807 n.10 (3d Cir. 1999) (determining that the first set of fraudulent wire transfers in a scheme could not be prosecuted as money laundering because these transfers did not yet create proceeds of wire fraud). And wire fraud "usually create[s] proceeds only on execution of the first scheme," unlike other offenses. Castellini, 392 F.3d at 48; see Mankarious, 151 F.3d at 705 ("Wire fraud often does not give rise to proceeds until after a wire transfer."); cf. United States v. Foley, 783 F.3d 7, 16 (1st Cir. 2015) ("The crime of wire fraud was complete upon Foley's receipt of the mortgage loan funds.").

This framework leads us to two conclusions that guide our reading of § 1956(i)(1)(B) and aid in resolving whether Abbas participated in the transfer of "proceeds" from Massachusetts.

One, the victims' wire transfers from Massachusetts to Illinois or California could not be the predicate for venue for Abbas's money-laundering convictions because "[a] money launderer must obtain proceeds before laundering can take place."

- 32 -

Castellini, 392 F.3d at 47 (quoting Mankarious, 151 F.3d at 704). The evidence in the record shows only that the initial wire transfers from Linhares and Fessenden were transfers to obtain proceeds, not transfers of proceeds. Indeed, the government charged Abbas for the $7,500, $82,500, and $39,200 wire transfers that occurred after the money reached Abbas's accounts in Illinois and California because these were "sufficiently distinct" from the wires that generated proceeds. Misla-Aldarondo, 478 F.3d at 68. Just as the wires from Linhares and Fessenden could not warrant a money-laundering conviction because they were not transactions in "proceeds" of wire fraud, we cannot say that they were evidence that Abbas participated in the transfer of "proceeds" of wire fraud from Massachusetts. Cf. Johnson, 971 F.2d at 569-70.

Two, the record does not show that Abbas controlled the wired funds until after Linhares and Fessenden transferred them out of Massachusetts. Section 1956's use of "proceeds" requires that there be evidence that the funds are in the defendant's possession or at his disposal. While this does not require physical possession, it implies at least some constructive control over funds before they can be considered "proceeds" of crime. See In re Brown, 953 F.3d at 624 (defendant obtained "proceeds" of bankruptcy fraud where he transferred the money to a close family member because the funds were in his constructive control). Nothing in the record shows that Abbas could use or exercise

- 33 -

control over the funds here before Linhares and Fessenden sent them out of Massachusetts. To the contrary, Special Agent Bell testified that victims of romance scams or Business Email Compromises can "even pull back a wire that's initiated," suggesting that the funds from Linhares and Fessenden were not within Abbas's control and therefore not proceeds until the transfer was completed. Cf. Piervinanzi, 23 F.3d at 677 (vacating money-laundering conviction based on a $24 million wire transfer even though the funds were transferred because the money "never came into the possession or under the control of the conspirators").

Reviewing the record in the light most favorable to the jury's venue finding, we find that a rational jury, instructed as this jury was under § 1956(i)(1)(B), could not conclude that venue was proper in Massachusetts on Counts Three through Five. The evidence demonstrates that, at the earliest, Abbas acquired "proceeds" of wire fraud when the funds entered his bank accounts in Illinois and California. By that point, his subsequent transactions to hide those funds -- which took place entirely outside of Massachusetts -- were sufficiently distinct from the wire transfers that created the funds, and Abbas exercised sufficient control over the funds as evidenced by his ability to access and transfer them. So, that was the earliest point in which the funds could be deemed "proceeds" under § 1956. Thus, the jury

could not have reasonably concluded that he participated in the transfer of proceeds from Massachusetts.

Abbas did not "participate in the transfer of proceeds" of wire fraud when he facilitated the transfers from Massachusetts because those "were not transactions in proceeds of the wire fraud -- they were transactions to obtain those proceeds." Huff, 641 F.3d at 1232. And although the district court correctly recognized that a defendant may obtain "proceeds" before a crime is completed, nothing in the record shows that Abbas controlled the money until after it passed outside of Massachusetts. Rather, the only evidence of his control is his subsequent actions to move the money from Illinois and California.

The government's arguments otherwise do not persuade us.[6] First, the government implies that Abbas does not wrestle with § 1956(c)(9)'s express definition of "proceeds" and depicts Abbas's argument as an attempt to impose the substantive law of money laundering onto a venue provision. But the government does not illustrate why "proceeds" should mean one thing in §§ 1956(a) and another in (i), even though the usual presumption is that

---

[6] The government posits that Abbas "failed to address, and thus waived, any objection to the district court's conclusion that wires from the Massachusetts victims could be deemed property derived from some form of unlawful activity" (cleaned up). But Abbas's proposed instruction would have clarified that the wired funds could not be "proceeds" until they reached his account and were under his control. And he objected on this point numerous times below and does so here, hence he did not waive his argument.

- 35 -

"identical words used in different parts of the same act are intended to have the same meaning." Morales, 801 F.3d at 5 (quoting Dep't of Revenue of Or. v. ACF Indus., Inc., 510 U.S. 332, 342 (1994)). Nor does the government engage with the text of § 1956(c)(9) and, specifically, its definition of "proceeds" as "property derived from or obtained or retained," verbs which seem to imply a prior act through which the property came to be in the defendant's possession or control. 18 U.S.C. § 1956(c)(9) (emphasis added). We, instead, heed § 1956's textual cues as we have explained above.

Second, the government argues that the jury could conclude that the wired funds became "proceeds" while "in transit" in Massachusetts. The jury instructions did not permit such a conclusion. The jury was instructed to determine whether a preponderance of the evidence showed that Abbas "participated in the transfer of the proceeds of . . . wire fraud[] from Massachusetts" (emphasis added). The victims' wire transfers from bank accounts in Massachusetts to bank accounts in Illinois or California were not transactions in proceeds under our caselaw. See Castellini, 392 F.3d at 48-49; Richard, 234 F.3d at 769-70; see also Johnson, 971 F.2d at 569-70.

Finally, the government urges us to rely on § 1956(i)(3) to affirm the jury's venue determination on Counts Three through Five. As we stated above, the government reasons that Abbas

conducted part of the underlying wire fraud in Massachusetts, so he can be prosecuted there. We reject the government's argument that a different statutory venue provision on which the jury was not instructed could provide venue.

Ordinarily, "[a]n appellate court may not lawfully sustain a conviction on a theory entirely different from the theory upon which the jury was charged." United States v. Gomes, 969 F.2d 1290, 1295 (1st Cir. 1992) (first citing Chiarella v. United States, 445 U.S. 222, 236 (1980); then citing United States v. Angiulo, 897 F.2d 1169, 1197 (1st Cir. 1990); and then citing United States v. Hill, 835 F.2d 759, 764 n.7 (10th Cir. 1987)). Here, the jury was only instructed on § 1956(i)(1)(B). While the government had ample opportunities to request that the jury be also or alternatively instructed under § 1956(i)(3), it chose not to invoke this provision until after the jury returned its verdict. Nor was § 1956(i)(3) discussed at any point before the verdict, including at the hearing on Abbas's motion to dismiss or the final jury-charging conference. Rather, at both hearings, the government either argued for venue on § 1956(i)(1)(B) alone or acquiesced to its being the only part of the statute at issue. The record thus does not offer a single instance in which the government attempted to present this theory to the jury. Under these unique circumstances, "we will not speculate upon whether"

venue was appropriate under § 1956(i)(3).  Chiarella, 445 U.S. at 236; cf. Percoco v. United States, 598 U.S. 319, 331-33 (2023).

We thus vacate and remand Abbas's convictions on Counts Three through Five and instruct the district court to dismiss these Counts without prejudice for lack of venue.  See Salinas, 373 F.3d at 170.  We note that this does not trigger the Double Jeopardy Clause, so Abbas may be retried on these Counts in any appropriate venue.  See Smith v. United States, 599 U.S. 236, 253-54 (2023).  Because we vacate and remand these convictions, we will not opine on Abbas's remaining challenges relevant thereto, including his sufficiency challenges for those Counts, and whether the jury was properly instructed on venue under 18 U.S.C. § 1956(i)(3) and on the meaning of "proceeds."

Our ruling today is a narrow one.  Venue did not lie in Massachusetts under § 1956(i)(1)(B) here because the jury could not conclude from the evidence presented that the wire transfers from Massachusetts were transactions in "proceeds."  And we may not consider § 1956(i)(3) because it was not presented to the jury.  Accordingly, Abbas's convictions on Counts Three through Five are vacated and remanded.

**C. Conspiracy to Commit Money Laundering (Count Six (B))[7]**

**i. Sufficiency of the Conspiracy Evidence**

Abbas notes that, to prove his intent to conspire, the government needed to show that he "knew that the property involved" for the transactions charged in Counts Four and Five "had been derived from some form of criminal activity." United States v. Carucci, 364 F.3d 339, 343 (1st Cir. 2004). He thus argues that the government did not prove this knowledge.

However, the jury could infer that Abbas "had general knowledge" of the money's "criminal nature." United States v. Rivera-Izquierdo, 850 F.3d 38, 49 (1st Cir. 2017) (quoting Richard, 234 F.3d at 769). Consider, for instance, how a bank investigator informed Abbas about the suspicious nature of the $7,500 wire from Phoenicia and closed his account because of this. Abbas heard this in August of 2017, and yet received fraudulent funds through

---

[7] Count Six (B) charged Abbas with conspiring to commit Counts Four and Five. Although we vacate Counts Four and Five for lack of venue, that does not affect Abbas's conviction under Count Six (B) because that Count raises distinct venue and sufficiency-of-the-evidence questions. Cf. United States v. Márquez-Figueroa, 187 F. App'x 18, 21 (1st Cir. 2006) (per curiam) (citing United States v. Powell, 469 U.S. 57, 66 (1984)) ("[A]cquittal on one count does not preclude conviction on another count based upon the same evidence, as long as that evidence is legally sufficient to support a finding of guilt on the count of conviction."). "Even if we were to view this as an inconsistency," that does not warrant "overturning a conviction that is sufficiently supported by the evidence" and laid in the proper venue. United States v. Angulo-Hernández, 565 F.3d 2, 7 (1st Cir. 2009) (citing United States v. DeCologero, 530 F.3d 36, 69 (1st Cir. 2008)).

identical circumstances from Fessenden on December 12 and 14, 2018, evidence that greatly undermines his claim that he was unaware that these funds were illegally obtained. This, along with the evidence showing that Abbas owned the accounts and engaged in multiple suspicious transactions, demonstrated his knowledge that the $82,500 and $39,200 wires included money derived from fraud. See Rivera-Izquierdo, 850 F.3d at 49 (finding that the jury could infer intent to commit unlawful monetary transactions where "the government presented wide-ranging evidence of [the defendant's] participation in the fraud scheme").

Abbas also contends that the evidence was insufficient to establish that the laundered proceeds "were derived from illegal activity." To him, these proceeds included money from sources that did not underlie the counts of conviction, and evidence in the record suggested that the amount that he allegedly laundered exceeded the amount that he received from the victims.

But we have remarked that the government need not prove that all the money laundered through illegal transactions "constituted the proceeds of . . . fraud." United States v. McGauley, 279 F.3d 62, 71 (1st Cir. 2002). That would "eviscerate" § 1957, "permitting one to avoid its reach simply by commingling proceeds of unlawful activity with legitimate funds." Id. On this basis, we upheld a money-laundering conviction where the jury could have found that the laundering transactions "included

- 40 -

proceeds" of fraud. Id.; see also United States v. George, 761 F.3d 42, 53-54 (1st Cir. 2014); Rivera-Izquierdo, 850 F.3d at 45 ("[T]he government needed to prove only that the money . . . constituted property 'derived from' the fraud's 'proceeds.'").

With that in mind, recall that Fessenden wired $111,000 to Sparta's account on December 12 and 14, 2018. Abbas then wired $82,500 and $39,200 from Sparta's U.S. Bank account to TCL Air Conditioner and Abbas's personal TD bank account, respectively, on December 13 and 14. Because of Abbas's rapid transfers and this suspicious timing, the jury could conclude that these transfers at least "included" the proceeds of fraud. McGauley, 279 F.3d at 71; see Rivera-Izquierdo, 850 F.3d at 45.

### ii. Conspiracy Venue

Abbas challenges venue in Massachusetts on the Count Six (B) charge that he conspired to commit the monetary transactions and laundering offenses charged in Counts Four and Five. He contends that the respective transfers of $82,500 and $39,200 "took place solely where the funds resided at the time of the unlawful monetary transactions," in Sparta's bank account in California.

Another portion of § 1956(i), however, insulates Count Six (B). Section 1956(i)(2) provides for venue in money-laundering-conspiracy prosecutions "in the district where

- 41 -

venue would lie for the completed offense . . . or in any other district where an act in furtherance of the attempt or conspiracy took place."  See Georgiadis, 819 F.3d at 10-11.  Venue is thus proper where "an overt act in furtherance of the conspiracy was committed, even where an overt act is not a required element of the conspiracy offense."  Whitfield v. United States, 543 U.S. 209, 218 (2005).  The district court instructed the jury to decide whether a preponderance of evidence showed "that at least part of the conspiracy . . . took place in Massachusetts," reflecting this standard.

We affirm the jury's reasonable conclusion under this standard based on the evidence presented.  The government presented significant evidence that Abbas's unknown coconspirators sent emails into Massachusetts to induce Fessenden to wire $111,000 on December 12 and 14, 2018.  These emails were overt acts that furthered the conspiracy because the steps a conspirator takes to produce the proceeds subsequently laundered furthers a money-laundering conspiracy.  See United States v. Day, 700 F.3d 713, 727 (4th Cir. 2012) (venue was proper under § 1956(i)(2) in the district into which the defendant's coconspirators sent emails to the victimized agency's personnel); United States v. Green, 599 F.3d 360, 372, 374 (4th Cir. 2010) (venue was proper under § 1956(i)(2) in the district where "acts aimed at obtaining the proceeds from trafficking in illegal narcotics" took place,

including where the drugs were sold); United States v. Myers, 854 F.3d 341, 354 (6th Cir. 2017) (venue was proper under § 1956(i)(2) in the district where the defendant stole motor homes, the sales of which generated proceeds that were laundered in other districts). And Fessenden responded to these emails in Massachusetts, where she lived. See, e.g., United States v. Iossifov, 45 F.4th 899, 911 (6th Cir. 2022) (considering, in part, that "various victims were located" within the venue district before affirming the jury's venue determination under § 1956(i)(2)). Because this at least amounted to a preponderance of the evidence that "act[s] in furtherance of" the conspiracy to launder money took place in Massachusetts, the jury could have reasonably found that venue was proper for Count Six (B). 18 U.S.C. § 1956(i)(2).

### D. Evidentiary Challenges

Abbas raises two preserved evidentiary challenges. "We review preserved objections to evidentiary rulings for abuse of discretion, reversing only if any abused discretion caused more than harmless error." United States v. Galíndez, 999 F.3d 60, 64 (1st Cir. 2021) (citing United States v. Taylor, 848 F.3d 476, 484 (1st Cir. 2017)). The government bears the burden to show that an error was harmless, meaning "that it is highly probable that the error did not contribute to the verdict." Id. (quoting Taylor, 848 F.3d at 484). For errors "of constitutional dimension," the

government must "prove beyond a reasonable doubt" that the allegedly harmless error "did not influence the verdict." <u>United States</u> v. <u>Sasso</u>, 695 F.3d 25, 29 (1st Cir. 2012) (first citing <u>Chapman</u> v. <u>California</u>, 386 U.S. 18, 23-24 (1967); and then citing <u>United States</u> v. <u>Argentine</u>, 814 F.2d 783, 789 (1st Cir. 1987)).

### i. Rule 404(b) Challenge as to Wire-Fraud Counts

Abbas moved to exclude, under Federal Rules of Evidence 403 and 404(b), evidence concerning fraud victims who were not the direct basis for the charges in the indictment, i.e., not Linhares or Fessenden. The district court determined that this evidence was either "intrinsic" to the fraud charged in the indictment or, in the alternative, relevant and not unfairly prejudicial. Abbas posits that the evidence was "not intrinsic" to the crimes he was charged with, but was propensity evidence inadmissible under Rule 404(b). He further contends that whatever relevance this evidence had was substantially outweighed by unfair prejudice because this conduct was totally separate from the specific charged conduct in the indictment.

The district court's ruling that the evidence was intrinsic was correct. "Evidence of bad acts that are 'part of the charged crime' is admissible as 'intrinsic' evidence" and not subject to Rule 404(b). <u>United States</u> v. <u>Ramirez-Frechel</u>, 23 F.4th 69, 76 (1st Cir. 2022) (quoting <u>United States</u> v. <u>Rodríguez-Soler</u>, 773 F.3d 289, 297-98 (1st Cir. 2014)). This includes evidence

proving a defendant's involvement in the underlying wire-fraud scheme.  See McGauley, 279 F.3d at 72; United States v. Santagata, 924 F.2d 391, 393-94 (1st Cir. 1991).  Evidence that Abbas helped defraud others besides Linhares and Fessenden by providing his account information to facilitate wire fraud was evidence pertaining to the overall scheme to defraud, so it was admissible notwithstanding Rule 404(b).  See, e.g., McGauley, 279 F.3d at 72 (affirming admission of 217 fraudulent checks that were not charged in the indictment); United States v. DeSimone, 699 F.3d 113, 124 (1st Cir. 2012).

This evidence was also relevant.[8]  Evidence is relevant if it tends "to make a fact more or less probable than it would be without the evidence" and that fact "is of consequence in determining the action."  Fed. R. Evid. 401.  "'[R]elevancy is a very low threshold' that only requires the tendered evidence to 'move the inquiry forward to some degree.'"  United States v. Rathbun, 98 F.4th 40, 51 (1st Cir. 2024) (quoting United States v. Cruz-Ramos, 987 F.3d 27, 42 (1st Cir. 2021)).  Evidence that Abbas received money through the same pattern of suspicious conduct on several occasions cleared this threshold.  It undermined Abbas's

---

[8] Abbas clarifies in his reply brief that he believes the evidence was irrelevant because it lacked any connection to him, but he admits that the transfers from Gatto, Lambert, Hockerson, Paulson-Cheek, and Conquest went into "an account held by Phoenicia, Katchi, or Midamines."  He set up those entities and their bank accounts, so the evidence was probative of his actions.

argument that he was innocent and helped prove the scheme to defraud. See Santagata, 924 F.2d at 394 (admitting allegedly repetitive evidence proving a fraud scheme because that "repetition . . . was itself distinctly probative" of the scheme) (quoting United States v. Rodriguez-Estrada, 877 F.2d 153, 156 (1st Cir. 1989)). And it demonstrated the modus operandi Abbas and his coconspirators employed: use spoofed emails to induce victims to send money to accounts Abbas controlled and quickly whisk that money away. See DeSimone, 699 F.3d at 125.

Abbas contends that this evidence comprised the government's entire case, so it was unfairly prejudicial. Rule 403 permits the district court to exclude otherwise "relevant evidence if its probative value is substantially outweighed" by "unfair prejudice," among other things. Cf. Rathbun, 98 F.4th at 51 ("[T]here is no debate that the trial court judge possesses considerable latitude in Rule 403 rulings.") (internal quotation marks omitted). But the record belies Abbas's argument for why this evidence was unfairly prejudicial. Ample evidence connected Abbas to the charged transfers from Linhares and Fessenden, including that he controlled the accounts that the funds were sent to, so this evidence concerning other victims of the same scheme was "hardly inflammatory." United States v. Robles-Alvarez, 874 F.3d 46, 51 (1st Cir. 2017); cf. United States v. Santana, 342 F.3d 60, 67 (1st Cir. 2003) (finding that evidence of similar acts

was not unfairly prejudicial, in part, where the government introduced other evidence of the defendant's involvement in a conspiracy). We thus affirm the district court's decision to admit this probative evidence.

### ii. Exclusion of Witness Testimony as to Wire-Fraud Counts

Before us, Abbas claims that excluding Boudreau's testimony about how a wire transfer takes place violated his constitutional right to defend himself. He contends that this evidence was relevant for disproving venue on the wire-fraud charges[9] and to show that no interstate nexus existed for those charges.

We affirm the district court's ruling because the testimony did not tend to prove that venue was improper in Massachusetts for wire fraud. Abbas assumes that venue on the wire-fraud charges included where a wire originates, see Pace, 314 F.3d at 349-50, and Boudreau would have testified that the instruction for the wire transfers originated in Massachusetts. Boudreau's testimony, if anything, would have emphasized why venue was proper in Massachusetts by specifying that Linhares and Fessenden sent the wire-transfer instructions from Massachusetts. The difference between saying that Linhares and Fessenden sent

---

[9] Because we vacate and remand on Counts Three through Five, we need not speculate on whether Boudreau's testimony was relevant to those Counts.

- 47 -

instructions to wire funds from Massachusetts and saying that they sent a "wire" from Massachusetts is semantical because, either way, the wire originated in Massachusetts.

And this testimony was irrelevant to Abbas's theory about the interstate-nexus element. This element of wire fraud requires "the use of interstate or foreign 'wire communications' to further that scheme." United States v. Valdés-Ayala, 900 F.3d 20, 33 (1st Cir. 2021) (quoting DiRosa, 761 F.3d at 150-51) (finding this element met where the defendant sent emails that would have crossed state lines). Boudreau would have testified that "the electronic transferring of funds involved banks" in other states, even if it is more accurate to say that Linhares and Fessenden sent an instruction, from Massachusetts to Texas, to transfer funds. Tum, 707 F.3d at 73. Thus, whether the transfers from Massachusetts were described as "instructions" or "wires" makes no difference because the overall sequence involved the use of an interstate wire. Cf. id. at 70, 73 (finding interstate nexus where the defendant initiated a wire transfer in Maine which (1) sent information to a South Carolina server, (2) then was processed in Florida, and (3) then led to electronic transfers involving banks in Ohio and Illinois).

This spells the end for Abbas's constitutional claim. A defendant "does not have an unfettered right to offer testimony that is . . . inadmissible under standard rules of evidence."

<u>Taylor</u> v. <u>Illinois</u>, 484 U.S. 400, 410 (1988). Boudreau's testimony was "properly ruled irrelevant," so Abbas's constitutional right to defend himself was not impaired. <u>United States</u> v. <u>Brown</u>, 669 F.3d 10, 20 (1st Cir. 2012) (quoting <u>United States</u> v. <u>Vázquez-Botet</u>, 532 F.3d 37, 51 (1st Cir. 2008)) (citing <u>United States</u> v. <u>Maxwell</u>, 254 F.3d 21, 26 (1st Cir. 2001)).

## E. Jury Instructions

### i. Instruction on "Conspiracy"

We turn next to Abbas's argument about the district court's conspiracy instruction. "[W]e review challenges to the propriety of jury instructions de novo. However, where, as here, a defendant fails to properly preserve an objection at trial, we review the record under the plain-error standard." <u>United States</u> v. <u>Delgado-Marrero</u>, 744 F.3d 167, 184 (1st Cir. 2014) (citations omitted); <u>see</u> <u>United States</u> v. <u>Andino-Rodríguez</u>, 79 F.4th 7, 28-29 (1st Cir. 2023). Abbas objected only to the district court's refusal to give his good-faith, venue, attorney-representations, and proceeds instructions -- not the conspiracy instruction. That means plain error applies. And because Abbas does not address the plain-error standard in his briefing here, he waives this challenge. <u>See</u> <u>United States</u> v. <u>Colón-De Jesús</u>, 85 F.4th 15, 25 (1st Cir. 2023); <u>Cruz-Ramos</u>, 987 F.3d at 40 (defendant's failure to advance a specific argument about why a jury instruction was

incorrect, coupled with his failure to show plain error, meant that he waived that argument).[10]

### F. Sentencing and Restitution

Abbas's remaining challenges concern his sentence and restitution. The presentence investigation report grouped the six counts of conviction together under U.S.S.G. § 3B1.1. Finding that the Guidelines provisions for wire fraud shepherded its analysis, the district court imposed Abbas's sentence and restitution based on the monetary losses that he caused the victims.

Our standard practice when we vacate some but not every conviction under a multicount indictment "is to remand for resentencing on the other (non-vacated) counts." United States v. Tkhilaishvili, 926 F.3d 1, 21 (1st Cir. 2019) (quoting United States v. García-Ortiz, 657 F.3d 25, 31 (1st Cir. 2011)). We often do this because our ruling "may implicate the trial judge's comprehensive, interdependent imposition of a penalty and thus require resentencing on all counts." United States v. Francois,

---

[10] Even were we to overlook Abbas's waiver, we discern no error. The district court's instruction "substantially covered the key point that the requested instruction would have made": that the jury consider whether one, multiple, or no conspiracy existed. United States v. Bedini, 861 F.3d 10, 18 (1st Cir. 2017). Moreover, contrary to his perfunctory arguments, the district court relayed to the jury that it must find "an agreement . . . to commit money laundering" based on "the elements of the underlying offenses" and appropriately narrowed the jury's scope to the conspiracy as charged in Count Six.

715 F.3d 21, 34 (1st Cir. 2013) (quoting United States v. Melvin, 27 F.3d 710, 712 (1st Cir. 1994)); see also United States v. Pimienta-Redondo, 874 F.2d 9, 14 (1st Cir. 1989) (en banc) (noting that, in this scenario, "common sense dictates that the judge should be free to review the efficacy of what remains in light of the original plan, and to reconstruct the sentencing architecture upon remand").

We need not consider Abbas's remaining challenges. Because we vacate and remand on Counts Three through Five for lack of venue, we vacate Abbas's sentence and the restitution order imposed on Counts One, Two, and Six (B) and remand for further proceedings. See Tkhilaishvili, 926 F.3d at 20-21.

### III. Conclusion

We **affirm** Abbas's convictions on Counts One, Two, and Six (B). We **vacate and remand** Abbas's convictions on Counts Three through Five. Upon remand, we instruct the district court to dismiss these Counts without prejudice for lack of venue. We also **vacate** Abbas's sentence and the district court's restitution order and **remand** so that the district court may reconfigure its approach on both issues in the wake of our opinion.