# United States Court of Appeals
## For the First Circuit

No. 24-1831

UNITED STATES OF AMERICA,

Appellee,

v.

HASSAN ABBAS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Montecalvo, Lynch, and Thompson,
Circuit Judges.

James M. Mason, with whom Handelman & Mason LLC was on brief,
for appellant.

Randall E. Kromm, Assistant United States Attorney, with whom
Leah B. Foley, United States Attorney, was on brief, for appellee.

January 29, 2026

**THOMPSON, <u>Circuit Judge</u>.**

**OPENING**

Convicted fraudster Hassan Abbas is here again because of his role in "romance scams" and "business email compromises" that bilked *millions* from victims.  <u>See</u> <u>United States</u> v. <u>Abbas</u>, 100 F.4th 267, 273-74 (1st Cir. 2024) (defining the quoted terms).

The need-to-knows (for now) about what Abbas did are these.  Throwing the law — and his law license — to the wind, he opened bank accounts for his fake companies, into which others wired money after his co-schemers conned them into thinking that they'd be helping a romantic partner or completing a business deal (just two sleazy examples among many).  <u>See</u> <u>id.</u> at 275-76, 281. He'd then shift the funds to other accounts or siphon off cash for personal use.  <u>See</u> <u>id.</u>  And he didn't quit even after bank investigators confronted him.  <u>See</u> <u>id.</u> at 276-77.

Last time, we affirmed Abbas's wire-fraud and money-laundering-conspiracy convictions; vacated his money-laundering and unlawful-monetary-transaction convictions, his 108-month sentence, and his $2 million-plus restitution obligation; and remanded for resentencing.  <u>See</u> <u>id.</u> at 273-74, 279.  With resentencing now behind him, he's back attacking his new 87-month term (which falls below the guidelines range of 108 to 135 months) as procedurally and substantively unreasonable, and his reimposed

- 2 -

$2 million-plus restitution duty as legally excessive.[1]  But this time, we affirm across the board (assuming the reader's familiarity with Abbas going forward, we'll jump straight to the merits — relating only what's necessary to understand the issues on appeal).

**ARGUMENTS AND ANALYSIS**

**Procedural Reasonableness**

Contesting the procedural aspect of his lower-than-guidelines sentence, Abbas criticizes how the district judge set the base-offense level, applied certain money-laundering enhancements, calculated the loss amount, and denied a zero-point-offender reduction (all of this will become clearer as we go on).[2] We review preserved procedural-reasonableness claims for abuse of discretion — studying legal questions *de novo* and factfindings for clear error — but examine unpreserved claims (if not waived) for

---

[1] The exact restitution figure is $2,001,853.68.

[2] We can't exactly tell (and the parties don't specifically say) which version of the guidelines the judge used at resentencing.  But we'll assume (and neither side gives any reason not to) that the judge used the 2021 edition, the one in effect at the first sentencing.  See generally 18 U.S.C. § 3742(g) (directing a judge resentencing a defendant after a sentence vacatur to use the guidelines in effect on the date of the vacated sentence).  We'll use that version too (unless otherwise noted).  One more thing before moving on, however.  Because sentencing can be complicated stuff, see Molina-Martinez v. United States, 578 U.S. 189, 193 (2016) (politely describing the 600-page guidelines as "complex"), anyone needing a general refresher on how that process works should read United States v. Cruz-Ramos, 987 F.3d 27, 44 n.11 (1st Cir. 2021) — among other cases.

plain error.  See, e.g., United States v. Pupo, 995 F.3d 23, 29 (1st Cir. 2021).[3]  Now sit back as we explain why none of Abbas's arguments stick.

*Base-Offense Level*[4]

As he did below, Abbas argues that the judge should've applied base-level 6 rather than 7 under USSG § 2B1.1 — the fraud guideline ("USSG," by the way, is short for "United States Sentencing Guidelines").[5]  Our *de novo* study leads us to a different conclusion, the one the government pushes for.

Everyone agrees that Abbas's 18 U.S.C. § 1956(h) money-laundering-conspiracy conviction is the pertinent conviction for sentencing purposes.  The base level for that conviction is

---

[3] We'll vacate a sentence on plain error if the defendant shows not just an error but an obvious error that affected substantial rights *and* the overall integrity of the judicial process.  See, e.g., United States v. Fargas-Reyes, 125 F.4th 264, 270 (1st Cir.), cert. denied, No. 25-6086, 2025 WL 3620480 (U.S. Dec. 15, 2025).

[4] We'll sometimes use "base level" instead of "base-offense level" (to save some keystrokes).

[5] USSG § 2B1.1 provides (bolding omitted):

    (a)  Base Offense Level:

        (1)  7, if (A) the defendant was convicted of an offense referenced to this guideline; and (B) that offense of conviction has a statutory maximum term of imprisonment of 20 years or more; or

        (2)  6, otherwise.

calculated using USSG § 2S1.1 — the money-laundering guideline.

And that guideline says that the base level comes from "[t]he

offense level for the *underlying offense* from which the *laundered*

*funds were derived*" if that level is ascertainable.  See USSG

§ 2S1.1(a)(1) (emphases added).[6]

---

⁶ USSG § 2S1.1(a) reads in full (bolding omitted):

> (a)   Base Offense Level:
>
>     (1)   The offense level for the underlying
>           offense from which the laundered
>           funds were derived, if (A) the
>           defendant committed the underlying
>           offense (or would be accountable for
>           the underlying offense under
>           subsection (a)(1)(A) of § 1B1.3
>           (Relevant Conduct)); and (B) the
>           offense level for that offense can
>           be determined; or
>
>     (2)   8 plus the number of offense levels
>           from the table in § 2B1.1 (Theft,
>           Property Destruction, and Fraud)
>           corresponding to the value of the
>           laundered funds, otherwise.

USSG § 2S1.1(a) once pegged the base level "for all money laundering" to "the amount of funds laundered, regardless of" the offenders' "culpability." United States v. Blackmon, 557 F.3d 113, 119 (3d Cir. 2009) (citing USSG § 2S1.1 (2000)).  But thanks to an amendment, § 2S1.1(a) — to simplify just a bit — differentiates between "direct money launderers" under USSG § 2S1.1(a)(1) and "third party money launderers" under USSG § 2S1.1(a)(2).  See USSG Supp. to App. C., Amend. 634, at 167 (2001).   "[D]irect money launderers" are "offenders who commit[ted]" the crime that "generated the criminal proceeds," while "third party launderers" are "offenders who launder[ed] the proceeds generated from [the] underlying [crimes]" that they didn't "commit."  Id.  "Not surprisingly," direct-money launderers "sentenced under [USSG § 2S1.1](a)(1) often get[] . . . *higher* sentence[s] than . . . less culpable" third-party launderers

- 5 -

Everyone also agrees that Abbas got the laundered funds through wire fraud, violating 18 U.S.C. § 1343. And the guideline applicable to wire fraud — USSG § 2B1.1 — states (repeating the quoted language in footnote 5):

(a) Base Offense Level:

    (1) 7, if (A) the defendant was convicted of *an offense referenced to this guideline*; and (B) that *offense of conviction* has a statutory maximum term of imprisonment of 20 years or more; or

    (2) 6, otherwise.

Id. (bolding omitted but emphases added). "[A]n offense is 'referenced to this guideline'" if "this guideline is the applicable Chapter Two guideline specifically referenced in Appendix A (Statutory Index) for the offense of conviction." See USSG § 2B1.1 cmt. n.2(A).

Which brings us to Abbas's argument. Starting from an accepted premise, he says that his "conspiracy conviction constituted a violation of 18 U.S.C. § 1956(h)." He then notes that "the Statutory Index at Appendix A for that [18 U.S.C. § 1956(h)] conviction" doesn't "reference[]" USSG § 2B1.1. And so he concludes that the "referenced to this guideline" requirement

---

"sentenced under [USSG § 2S1.1](a)(2)." Blackmon, 557 F.3d at 119 (emphasis added); accord United States v. Menendez, 600 F.3d 263, 267-68 (2d Cir. 2010). All this will become *very* important later in our opinion.

- 6 -

in USSG § 2B1.1(a)(1)(A) isn't "fulfilled" — meaning (again in his words) the judge should've applied "a base offense level of 6."

Viewed against the legal background described above (in the paragraphs beginning "Everyone agrees . . ." and "Everyone also agrees . . . "), Abbas's claim fails.  USSG § 2S1.1(a)(1)(A) says that the base level for a money-laundering conspiracy violating 18 U.S.C. § 1956(h) is "[t]he offense level for *the underlying offense*" that produced "the laundered funds" (emphasis added).  For Abbas that's the 18 U.S.C. § 1343 wire-fraud "offense" he stands "convicted" of.  See USSG § 2B1.1(a)(1).  Using 18 U.S.C. *§ 1343*, we flip to Appendix A.  And because 18 U.S.C. § 1343 *is* "referenced to" USSG § 2B1.1 there, see USSG § 2B1.1 cmt. n.2(A) & app. A, *and* has a "maximum" sentence of 30 years, see USSG § 2B1.1(a)(1) & 18 U.S.C. § 1343, base-level 7 is right.  See United States v. Otunyo, 63 F.4th 948, 956 (D.C. Cir. 2023) (applying a similar approach in a similar situation); United States v. Capps, 977 F.3d 250, 255-56 (3d Cir. 2020) (ditto); United States v. Nikolovski, 565 F. App'x 397, 401-02 (6th Cir. 2014) (per curiam) (unpublished) (also ditto).  This take jibes with USSG § 2S1.1's purpose of "promot[ing] proportionality by providing increased penalties for defendants who launder funds derived from more serious underlying criminal conduct."  See Menendez, 600 F.3d at 269.  And it fits hand-in-glove with our long-held view that USSG § 2S1.1(a) "directs the sentencing court

to take as the base offense level . . . the full calculated offense level that applies to the offense which produced the laundered funds" — meaning the court must "calculate the sentence as it would have applied to the [underlying] count[] *standing alone*." See United States v. Cruzado-Laureano, 440 F.3d 44, 48 (1st Cir. 2006) (emphasis added).

Ever-persistent, Abbas's reply brief brushes off the idea "that the wire fraud conviction establishes the conviction necessary for USSG § 2B1.1(a)(1)(A) and (B)." He still believes in his heart of hearts that USSG § 2B1.1(a)(1)(A)'s "convicted of an offense referenced to this guideline" lingo sends the reader back to the "money laundering conspiracy conviction under 18 U.S.C. § 1956(h)." And from there he notes that "the Statutory Index" *doesn't* list USSG § 2B1.1 as the guideline applicable to 18 U.S.C. § 1956(h). But the problem for him is that USSG § 2B1.1(a)(1)(A) "does not say '*the*' offense of conviction" — "[i]t says '*an*' offense of conviction." See Otunyo, 63 F.4th at 957 (emphases added). And that "textual difference matters" big time, because "'an' . . . mean[s] 'any one.'" Id. (quoting Webster's New Universal Unabridged Dictionary 63 (2d ed. 1983)). So rather than "refer[ring] a reader back to the definite money laundering count[]," USSG § 2B1.1(a) "tells a [judge] that if, (1) '*any one*' of the defendant's convictions is governed by § 2B1.1 and (2) that offense carries a maximum term of 20 or more years, then the base

- 8 -

offense is seven." Id. (emphasis added). Abbas's wire-fraud conviction meets both musts. Ergo what he says here doesn't change our thinking.

Abbas also cites a quad of cases — United States v. Hallahan, 756 F.3d 962 (7th Cir. 2014), United States v. Abdelsalam, 311 F. App'x 832 (6th Cir. 2009) (unpublished), United States v. Klassy, 409 F. App'x 169 (9th Cir. 2011) (unpublished), and United States v. Osuji, 413 F. App'x 603 (4th Cir. 2011) (unpublished) — that he says should get him base-level 6. But none of those opinions helps him. In three of the cases, the government there — unlike here — "concede[d]" that the judge botched the base level. See Hallahan, 765 F.3d at 979; Klassy, 409 F. App'x at 171; Osuji, 413 F. App'x at 613. And with no pushback to consider, each of those decisions accepted the concessions without doing the type of Otunyo analysis (involving a clear-cut reading of the guidelines) that we find so convincing. The fourth case accepted the premise that a judge should use the defendant's money-laundering conviction when seeing if the offense is "referenced to" USSG § 2B1.1 (one could infer that an embrace of that premise drove what happened in the other three cases too). See Abdelsalam, 311 F. App'x at 844-45. But as we've taken special pains to show, the correct reference point is the *underlying offense* that produced the laundered money and whether *that offense* is "referenced to" USSG § 2B1.1. The takeaway is that we'll still

- 9 -

follow the more on-point <u>Otunyo</u> opinion (and the <u>Otunyo</u>-like cases, <u>Capps</u> and <u>Nikolovski</u>) — which together with the <u>Cruzado-Laureano</u> decision supports the judge's ruling.

Shifting focus, Abbas claims that a guidance document from the sentencing commission (the body that developed the sentencing-guidelines system) shows the judge should've used base-level 6. <u>See</u> U.S. Sent'g Comm'n, Off. of Educ. & Sent'g Prac., § 2B1.1(a)(1) or (2) — Fraud Base Offense Level (Aug. 2018), https://www.ussc.gov/sites/default/files/pdf/training/annual-national-training-seminar/2018/fraud-BOL_one-pager.pdf [https://perma.cc/Z6KR-3Z3J]. Not so, we say. That document does include an example calling for base-level 6 for a money-laundering conviction where the underlying crime was wire fraud. <u>Id.</u> at 2. But the defendant in that example was only "*involved* in a wire fraud scheme," *not* convicted like § 2B1.1(a)(1) requires. <u>Id.</u> (emphasis added). And the only example in the document involving a defendant "*convicted*" of wire fraud (like Abbas) calls for base-level 7. <u>Id.</u> (emphasis added).

Abbas then argues that the rule of lenity requires that we read the sentencing guidelines favorably to him. But that rule applies *only* when there's a "*substantial* ambiguity" in the guidelines. <u>United States</u> v. <u>Pinkham</u>, 896 F.3d 133, 138 (1st Cir. 2018) (emphasis added) (quoting <u>United States</u> v. <u>Suárez-González</u>, 760 F.3d 96, 101 (1st Cir. 2014)). And we find no such "substantial

ambiguity" here, for the reasons recorded above.  See generally Muscarello v. United States, 524 U.S. 125, 138-39 (1998) (noting that the rule operates when there's a "grievous ambiguity or uncertainty," and "only if, after seizing everything from which aid can be derived," a court "can make no more than a guess as to what Congress intended" — adding also that a "grievous ambiguity" requires more than the "simple existence of some . . . ambiguity" (quotation omitted)); Callanan v. United States, 364 U.S. 587, 596 (1961) (stating that the rule "serves as an aid for resolving an ambiguity; it is not to be used to beget one" — adding too that it's a last-resort canon of construction, not a principle to ponder "at the beginning [of construction] as an overriding consideration of being lenient to wrongdoers").

*Money-Laundering Enhancements*

Standing by what he argued below, Abbas next faults the judge for adding 2 levels under USSG § 2S1.1(b)(2)(B) because (per the judge) the money-laundering-conspiracy conviction implicated 18 U.S.C. § 1956(h), and another 2 levels under USSG § 2S1.1(b)(3) because (also per the judge) the offense involved sophisticated means.  As for us, we second the government's view that the judge didn't err.

USSG § 2S1.1(b)(2)(B) ups the base level by 2 if the defendant stands convicted of 18 U.S.C. § 1956(h), which bans money-laundering conspiracy.  That's 1 level more than USSG

§ 2S1.1(b)(2)(A) specifies for a defendant convicted of 18 U.S.C. § 1957, which bans substantive-money-laundering crimes. USSG § 2S1.1(b)(3) adds 2 levels *if* the offense involved sophisticated laundering *and* the judge applied the 2-level tack-on under USSG § 2S1.1(b)(2)(B). Throw out the 2 levels from USSG § 2S1.1(b)(2)(B), and the 2 levels from USSG § 2S1.1(b)(3) go too.

The jury convicted Abbas of money-laundering *conspiracy* under 18 U.S.C. § 1956(h). So USSG § 2S1.1(b)(2)(B) applies by its terms. Wait a minute, Abbas responds. Application Note 3(C) to USSG § 2S1.1 — under the caption "Application of Subsection (a)(2)" — provides:

> Non-Applicability of Enhancement.—Subsection (b)(2)(B) shall not apply if the defendant was convicted of a conspiracy under 18 U.S.C. § 1956(h) and the sole object of that conspiracy was to commit an offense set forth in 18 U.S.C. § 1957.

USSG § 2S1.1 cmt. n.3(C) (bolding omitted). And, he goes on, that fits this situation to a T because the sole object of the money-laundering conspiracy *was* a crime specified in 18 U.S.C. § 1957 — unlawful monetary transactions. But like the judge (whose analysis the government champions), we conclude that because Note 3(C) comes under the caption "Application of Subsection (a)(2)," it controls *only* when the base level comes from USSG § 2S1.1(a)(2). Abbas's base level came from USSG § 2S1.1(a)(1), using the level for the underlying wire-fraud

crime — as we said in the opinion's last section.  So Application Note 3(C) falls away because USSG § 2S1.1(a)(2) *didn't* set his base level.

And United States v. Tedder, 403 F.3d 836 (7th Cir. 2005), doesn't change our minds either — despite Abbas's best efforts.  Tedder noted that — unlike "[t]he other five sub-parts of Application Notes 2 and 3" — Note 3(C) doesn't "explicitly refer to" USSG § 2S1.1(a)(1) *or* § 2S1.1(a)(2).  Id. at 843-44.[7]  Given

_____

[7] For context we quote Notes 2 and 3 in full (bolding omitted, italics added):

> 2.   Application of Subsection (a)(1).—
>
> (A)   Multiple Underlying Offenses.—In cases in which subsection (a)(1) applies and there is more than one underlying offense, the offense level for the underlying offense is to be determined under the procedures set forth in Application Note 3 of the Commentary to § 1B1.5 (Interpretation of References to Other Offense Guidelines).
>
> (B)   Defendants Accountable for Underlying Offense.—In order for subsection (a)(1) to apply, the defendant must have committed the underlying offense or be accountable for the underlying offense under § 1B1.3(a)(1)(A). The fact that the defendant was involved in laundering criminally derived funds after the commission of the underlying offense, without additional involvement in the underlying offense, does not establish that the defendant

- 13 -

committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused the underlying offense.

(C) Application of Chapter Three Adjustments.—Notwithstanding § 1B1.5(c), in cases in which subsection (a)(1) applies, application of any Chapter Three adjustment shall be determined on the offense covered by this guideline (*i.e.*, the laundering of criminally derived funds) and not on the underlying offense from which the laundered funds were derived.

3. Application of Subsection *(a)(2)*.—

(A) In General.—Subsection *(a)(2)* applies to any case in which (i) the defendant did not commit the underlying offense; or (ii) the defendant committed the underlying offense (or would be accountable for the underlying offense under § 1B1.3(a)(1)(A)), but the offense level for the underlying offense is impossible or impracticable to determine.

(B) Commingled Funds.—In a case in which a transaction, financial transaction, monetary transaction, transportation, transfer, or transmission results in the commingling of legitimately derived funds with criminally derived funds, the value of the laundered funds, for purposes of subsection *(a)(2)*, is the amount of the criminally derived funds, not the total amount of the commingled funds, if the defendant provides sufficient information to determine the amount of criminally derived

that reality, Tedder speculated that Note 3(C) had a "*general application*" — despite Note 3(C)'s heading. Id. at 844 (emphasis added). Convinced that Note 3(C)'s clear words "cover[ed] Tedder's situation" — he stood convicted of a conspiracy "under [18 U.S.C.] § 1956(h), and the sole object of that conspiracy was the substantive offense specified in [18 U.S.C.] § 1957" — Tedder couldn't "imagine why" Note 3(C)'s "application" should depend "on which subdivision of [USSG § 2S1.1(a)] was used" to generate the base level. Id. at 844 (first quote); id. at 842 (second quote); id. at 843 (third, fourth, and fifth quotes). Critically, "the United States offer[ed] no reason in its appellate brief," Tedder added, "and the [s]entencing [c]ommission was silent on the

_____

funds without unduly complicating or prolonging the sentencing process. If the amount of the criminally derived funds is difficult or impracticable to determine, the value of the laundered funds, for purposes of subsection *(a)(2)*, is the total amount of the commingled funds.

(C) Non-Applicability of Enhancement.— Subsection (b)(2)(B) shall not apply if the defendant was convicted of conspiracy under 18 U.S.C. § 1956(h) and the sole object of that conspiracy was to commit an offense set forth in 18 U.S.C. § 1957.

Neither side says that Application Note 1 — containing USSG § 2S1.1's definitions — matters here. Which makes Note 1 skippable.

- 15 -

subject." Id. at 843. Remarking that "[t]itles, headings, and captions" aren't "themselves rules of law," Tedder then said that Note 3(C)'s "evident purport" was to ensure that judges "impose the same punishment" for money laundering and money-laundering conspiracies (a citation-free statement, fyi) — a purpose equally applicable to both USSG § 2S1.1(a)(1) *and* USSG § 2S1.1(a)(2). Id. at 844.

But as we suggested in footnote 6, the sentencing commission amended USSG § 2S1.1(a) so that *direct launderers* covered by USSG § 2S1.1(a)(1) — the very subsection used to set Abbas's base level — end up with *higher* sentencing ranges than *third-party launderers* covered by § 2S1.1(a)(2). See, e.g., Menendez, 600 F.3d at 268-69. Which means that even if Tedder was right that the sentencing commission wanted to treat money laundering and money-laundering conspiracies equally (and Tedder cited no supporting caselaw for that position), what we've said about the commission's amendment is reason enough *not* to apply Note 3(C) in this situation. To be fair to Tedder (whose logic — as best we can tell — no other circuit court has adopted in the 20 years it's been on the books), that case didn't address the amendment because — as best we can gather — the government there (unlike here) didn't make an amendment-focused argument. See 403 F.3d at 842-44 (discussing the government's briefing).

And having so held, we can make quick work of Abbas's claim that the judge slipped in applying the sophisticated-laundering enhancement. Recall again how USSG § 2S1.1(b)(3) provides for a 2-level increase *if* the money-laundering enhancement under USSG § 2S1.1(b)(2)(B) applies *and* the crime involved sophisticated laundering. Abbas's claim depends entirely on the idea that the USSG § 2S1.1(b)(2)(B) enhancement *doesn't apply*. But because (as we said) it *does apply*, his claim collapses.

*Loss-Amount Enhancement*

Abbas complains that the judge erred in applying a 16-level enhancement by miscalculating the "loss" amount under USSG § 2B1.1(b)(1)(I) (telling judges to add 16 levels to a base level for losses above $1.5 million but below $3.5 million). More specifically, he blasts the judge for including losses based on "acquitted conduct" and including a "[w]holly foreign loss" not backed by sufficiently reliable evidence (all concede that reliability is the standard in this context). Agreeing with the government, we see no reason to reverse.

Capsulated, Abbas's acquitted-conduct argument runs this way.

- Count 6 of the operative indictment charged him with participating in a money-laundering conspiracy that had two objectives: concealing money laundering, as alleged

in Count 6(a), and engaging in unlawful monetary transactions, as alleged in Count 6(b).

- The jury found him guilty on Count 6(b) and not guilty on Count 6(a).

- But the judge wrongly included loss associated with the acquitted Count 6(a) anyway.[8]

Abbas's thesis doesn't hold, for a straightforward reason. The judge applied the 16-level enhancement *not by* "counting acquitted conduct" but *only by* "counting" losses tied to the wire-fraud convictions (those quotes come straight from the judge's mouth). Noting that those convictions involved a "scheme" to defraud, the judge said that the loss-amount calculation could include any "jointly undertaken activity" that's "reasonably foreseeable" as part of the "scheme." And, the judge added, one could "infer" that "the victim[s] sent the money to . . . Abbas because he forwarded his account information to his co-conspirators." So ultimately, the judge found the loss amount supportable as "part of the same scheme or plan" within the guidelines' "meaning" and "reasonably foreseeable" to Abbas. See United States v. Ahmed, 51 F.4th 12, 23 (1st Cir. 2022) (stating that "[d]efendants who engage in a 'jointly undertaken criminal

---

[8] Abbas's lead brief mentions "acquitted and *vacated* charges" (emphasis added). But his arguments center on acquitted Count 6(a).

activity' are responsible for . . . losses that result from 'reasonably foreseeable acts committed by others in furtherance of the jointly undertaken criminal activity'" (ommission in original) (quoting United States v. Delima, 886 F.3d 64, 72-73 (1st Cir. 2018), and USSG § 1B1.3(a)(1)(B))). But (as the government writes, without opposition), Abbas's initial brief doesn't address the basis for the judge's loss estimate (the document harps on the Count 6(a) acquittal). And so he's waived any challenge to it that he might have (something his reply brief can't undo). See, e.g., Miller v. Jackson, 152 F.4th 258, 271 (1st Cir. 2025) (citing authority "holding that a party commits waiver by 'fail[ing] to address in its opening brief a basis on which the district court ruled against that party'" (quoting parenthetically Vizcarrondo-González v. Vilsack, No. 20-2157, 2024 WL 3221162, at *7 (1st Cir. June 28, 2024) (unpublished))).

On, then, to the foreign-loss issue — beginning with some background.

Relying on the probation office's presentence report, the judge included in the loss calculation a $973,276.01 wire transfer from a law firm's account in Kenya to an Abbas-created company's account in Illinois — money that was Pak Sum Low's, from the sale of his house in Kenya. An FBI report from an agent's interview with Low explained that someone "pretending" to be him

- 19 -

got his lawyers (via an email message) to wire money to the Illinois account.  And he's never seen a penny from the sale.

Tackling the defense's argument "about foreign loss" and how "U.S. law doesn't apply extraterritorially," the judge at resentencing saw no problem because "the wire of the money was received in Chicago."  Abbas's lawyer responded that "not everything that touches the United States is a wire fraud if it's coming from a foreign entity."  "Well," the judge replied, "I'm not saying everything that touches.  I'm saying, finding, based on the evidence before me, that that [money] was part of a common scheme or plan and came to . . . Abbas's bank account in Chicago."

Abbas's lead claim — a rehash of what he argued below — is that the wire-fraud statute doesn't criminalize *purely* foreign conduct.  Our *de novo* review leaves us unconvinced.

Congress *can* enforce its laws beyond the nation's borders.  EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991).  Whether it *has* is a question of statutory interpretation, typically subject to the rule that "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application."  RJR Nabisco, Inc. v. Eur. Cmty., 579 U.S. 325, 335 (2016) (citing Morrison v. Nat'l Australia Bank, Ltd., 561 U.S. 247, 255 (2010)).  This "presumption against extraterritoriality" makes sense for many reasons.  Id.  One is that it reflects the "commonsense notion that Congress generally

legislates with domestic concerns in mind." Id. at 336 (citation omitted). Another is that it ensures that courts don't trigger "unintended clashes between our laws and those of other nations which could result in international discord." WesternGeco LLC v. ION Geophysical Corp., 585 U.S. 407, 412-13 (2018) (citation omitted). Of course, "if the object of a federal law is conduct that occurs in this country, the concerns associated with a potentially extraterritorial application of our laws do not come into play." United States v. Hussain, 972 F.3d 1138, 1142 (9th Cir. 2020) (citing RJR Nabisco, 579 U.S. at 335-37).

A two-step process exists for analyzing issues of extraterritoriality. See, e.g., WesternGeco, 585 U.S. at 413. Judges at step one see "whether the presumption against extraterritoriality has been rebutted — that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." RJR Nabisco, 579 U.S. at 337. If it doesn't, judges at step two "determine whether the case involves a domestic application of the statute" by "looking to the statute's 'focus.'" Id.

A statute's "focus" is "'the object of its solicitude,' which can include the conduct it 'seeks to regulate' as well as the parties and interests it 'seeks to protect' or vindicate." WesternGeco, 585 U.S. at 413-14 (quoting Morrison, 561 U.S. at 267) (citation modified). If a statute isn't extraterritorial

- 21 -

under step one, the issue under step two becomes whether the proscribed conduct occurred in this country to an adequate degree:

> If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.

RJR Nabisco, 579 U.S. at 337.

"Because a finding of extraterritoriality at step one will obviate step two's 'focus' inquiry," it'll "usually be preferable for courts to" take these steps sequentially. Id. at 338 n.5. But courts can also "start[] at step two in appropriate cases." Id. And this is one of those cases: "[b]ecause" the wire-fraud statute "contains difficult questions about whether Congress intended the statute to apply extraterritorially, we skip to the second step" and see "whether the . . . statute applies domestically based on the facts at hand 'by identifying the statute's focus . . . .'" See United States v. McLellan, 959 F.3d 442, 468 (1st Cir. 2020) (quoting WesternGeco, 585 U.S. at 413).

The elements of wire fraud are "(1) a scheme to defraud; (2) knowing and willful participation in the scheme with the intent to defraud; and (3) the use of interstate or foreign wire communications to further that scheme." Id. at 469 (quotations omitted). And applying step two, McLellan makes clear that "the

structure, elements, and purpose of the wire fraud statute indicate that its focus is not the fraud itself" but the "abuse" of the wires — so that when "a defendant is charged with wire fraud based on having sent or *received* wire communications while *in the United States* for the purpose of carrying out a scheme to defraud, the . . . statute has been applied *domestically* even if the victim is located outside of the United States." Id. at 469-70 (emphases added).

Moving from the general to the specific, it's clear that Abbas opened the Illinois bank account as an integral part of the wire-fraud scheme — an account he took money out of. See Abbas, 100 F.4th at 274-75. It's also clear that the at-issue $973,276.01 was fraudulently redirected from Low to the Abbas-controlled account in Illinois via a wire transmission originating internationally but *received* domestically — a scenario that amounts to "domestic conduct through domestic wires." See McLellan, 959 F.3d at 470; see also Hussain, 972 F.3d at 1143-45.

With this understanding, we can make short work of Abbas's initial claim that the wire-fraud statute doesn't apply extraterritorially. What he's pushing is a step-*one*-type argument (whether the statute is extraterritorial), not a step-*two*-type argument (whether the case involves a permissible domestic application of the statute, looking at the statute's focus). But he had to address step *two*, given (a) the judge's ruling — "I'm

- 23 -

not saying everything that touches" the United States, the money "came to [his] bank account in Chicago," *etc.*, and (b) McClellan's teachings — the statute's "focus" is the "abuse" of the wires, "having sent or received wire communications while in the United States" involves domestic-wires use, *etc.* And his opening brief's failure to do so means this argument isn't a difference-maker (a problem his reply brief can't cure). See, e.g., Miller, 152 F.4th at 271.

Abbas's cite to Kiobel v. Royal Dutch Petroleum Co., 569 U.S. 108 (2013), doesn't save the day. Kiobel held that "nothing" in the Alien Tort Statute "rebuts th[e] presumption" against extraterritoriality. Id. at 124. While noting that it's not enough for conduct to merely "touch and concern the territory of the United States" (the conduct must be domestic), see id. at 124-25, Kiobel stressed that "[b]ecause 'all the relevant conduct'" there "'took place outside the United States,'" the Court "did not need to determine . . . the statute's '*focus*,'" see RJR Nabisco, 579 U.S. at 337 (emphasis added) (discussing and quoting Kiobel). And once viewed correctly, Abbas's talk of Kiobel doesn't negate his failure to address "step two's 'focus' inquiry." See Hussain, 972 F.3d at 1142. Which again is his undoing.[9]

---

[9] Abbas also mentions out-of-circuit district-court cases that (in his words) have decided "that the 'focus' of the wire fraud statute is the scheme to defraud, such that there needs to be 'substantial' conduct in the United States that is 'integral'

Also not a winner is Abbas's claim that the FBI report wasn't reliable enough to show that the $973,276.01 represented a "loss" to Low. Because he didn't preserve this argument for appeal (as the government says, without opposition), he must run the plain-error gauntlet. But he can't establish plain error because he identifies no binding authority holding that a statement like his — highly detailed, made in person to the FBI, and backed by evidence — is *unreliable*. See, e.g., United States v. Morosco, 822 F.3d 1, 21 (1st Cir. 2016).

*Zero-Point-Offender Reduction*

Replicating a claim that the judge rejected, Abbas insists that he qualified for an offense-level reduction under USSG § 4C1.1, as a zero-point offender (*i.e.*, an offender with no criminal-history points) who hadn't "personally cause[d] substantial financial hardship."[10] Like the government, we disagree.

---

to the scheme, not simply the use of a U.S. wire in furtherance of the scheme, to establish a domestic offense." But his bid to squeeze juice out of these decisions comes to naught because our circuit's settled rule is that the wire-fraud statute's "focus" is the "abuse" of the wires — not (repeat, *not*) the scheme to defraud. McLellan, 959 F.3d at 469; see also Hussain, 972 F.3d at 1143-44 (noting that "[o]ther circuits have specifically determined that under . . . step two, the 'focus' of wire fraud statute is the misuse of the wires").

[10] USSG § 4C1.1 took effect in November 2023, after Abbas's original sentencing. See USSG § 4C1.1 (Nov. 2024) (historical note at 415). That provision applies retroactively, however. See id. And while awaiting the outcome of his first appeal, he unsuccessfully moved the judge to find he was a zero-point

Abbas conceded that the scheme caused Evelyn Fessenden substantial financial hardship (another trickster using a fake profile on a dating website had sweet-talked her into wiring $110,000 to one of Abbas's accounts, see Abbas, 100 F.4th at 274-76). But his lawyer told the judge that Abbas hadn't "personally cause[d]" the hardship because he hadn't "communicated with any victim, . . . solicited any victim to send funds," or "deceive[d]" any victim. The judge would have none of it, however.

Schemes like this, the judge said, cause loss when two things happen: "some[one] . . . dupe[s] . . . the victim to give up . . . her money" and "someone . . . receive[s] it." The duper and the receiver, the judge added, are often one and the same. But the judge rejected the idea that the "guideline . . . doesn't apply to joint activity, that it can only apply to activity undertaken by one person who did it all." And the judge used the following hypothetical to explain the point: "had the duper stood in front of . . . Fessenden and said, . . . give this man your money . . . and she gave it to him, he personally caused [the loss]," even though he's "not the only person who caused it."

---

offender — the judge ruling that he had "caused" substantial financial hardship "to at least one victim." Abbas's memo on resentencing "reiterate[d]" his request for a zero-point-offender reduction. Hinting that the earlier ruling could qualify as law of the case, the judge thought it "only fair" to "reconsider that" at the hearing. No one says the judge couldn't do a reconsideration. So we needn't dive any deeper into that.

Turning back to Abbas specifically, the judge found that "what the duper persuaded . . . Fessenden to do [was] give [money] to . . . Abbas," with Abbas "kn[owing] that it was the product of fraud." To continue quoting the judge, Abbas then

> took it, it was an integral part of the scheme. It was a necessary part of the scheme. The patina of legitimacy that the shell companies provided and the U.S. bank accounts, all of that helped to facilitate this scheme. So for all those reasons I think he personally caused it[;] therefore I think he's not eligible for [the reduction].

The judge did say that simply being a co-conspirator in a fraud scheme wouldn't suffice to show "personally cause[d]." But the judge deemed Abbas's own "activity . . . sufficient." A disagreeing defense counsel protested that he "read" the guidelines as saying that Abbas had to "caus[e] the harm himself."

Still sticking to his guns, Abbas's opening brief here says again that it was his co-conspirators and not he who'd conned others into wiring money. But (as the government notes, without contradiction), he makes no real attempt there to engage with the judge's ruling that the phrase "personally caused" can *sometimes* cover jointly undertaken activity involving dupers *and* money-receivers. Which can't get him the reversal he wants on this issue

(and his reply brief also can't fix that problem[11]).  See, e.g., Miller, 152 F.4th at 271.

Maybe Abbas thinks his opening brief's passing suggestion that "personally cause[d]" requires courts to consider but-for and proximate causation signals engagement.  But even if he does, we needn't tackle that suggestion because he doubly waived it — first by not squarely raising it below, then (as the government reports, without correction) by not meaningfully developing it here.  See, e.g., Mirabella v. Town of Lexington, 64 F.4th 55, 56-57 (1st Cir. 2023).  See generally Tayag v. Lahey Clinic Hosp., Inc., 632 F.3d 788, 792 (1st Cir. 2011) (concluding that failing to give "serious treatment [to] a complex issue" won't "preserve the claim on appeal").

---

[11] Even if we were tempted to excuse this waiver — and we *aren't* — Abbas's reply brief's cite to district-court cases like United States v. Daramola, No. 20-CR-2124 MV, 2024 WL 4241840 (D.N.M. Sept. 19, 2024) (unpublished), can't turn the tide for him.  Faced with a romance-scam scenario, the Daramola judge ruled "that defendants personally cause substantial financial hardship only when they are directly involved in defrauding the victim" — "not" just "when they act as *middlemen*" whose "*sole*" function is "to receive the money" the victim "transfer[s]" at the enticer's "request[]."  See id. at *5-6.  But accepting Daramola on its own terms (without saying whether it is or isn't correct, and still ignoring waiver concerns), we find the case distinguishable.  Abbas opened bank accounts for his many shell companies, moved money around so victims couldn't get it back, and lied when questioned about the dodgy doings — making him very much *unlike* the Daramola middleman-defendant.  Compare Abbas, 100 F.4th at 274-77, 289 (describing Abbas's role), with Daramola, 2024 WL 4241840, at *2-3, *6 (describing Daramola's role).

**Substantive Reasonableness**

Finding the below-guidelines sentence procedurally sound, we now check its substantive reasonableness (*i.e.*, we see if it's *too long*) — applying abuse-of-discretion review (as the parties agree we should).  See United States v. Huertas, 148 F.4th 1, 35-36 (1st Cir.), cert. denied sub nom. Pizarro-Mercado v. United States, No. 25-5981, 2025 WL 3507070 (U.S. Dec. 8, 2025) (adding that a sentence passes a substantive-reasonableness check if the judge's reasoning is "plausible" and the result is "defensible"); see also United States v. Correa-Osorio, 784 F.3d 11, 29 (1st Cir. 2015).  Winning a substantive-reasonableness challenge is a tall order because there's "no perfect sentence, but, instead, a wide universe of supportable sentencing outcomes." United States v. Munyenyezi, 781 F.3d 532, 542 (1st Cir. 2015) (quotation omitted).  And it's an even taller order "where, as here, the sentence imposed is significantly below the guideline[s] range."[12]  See United States v. Dunfee, 821 F.3d 120, 133 (1st Cir. 2016); see also United States v. Floyd, 740 F.3d 22, 39-40 (1st Cir. 2014) (holding that when "a district court essays a substantial downward variance from a properly calculated guideline

---

[12] After we vacated Abbas's 108-month prison sentence, the judge (recall) resentenced him to 87 months — far less than the guidelines range of 108 to 135 months.

sentencing range, a defendant's claim of substantive unreasonableness will generally fail").

Abbas claims that the judge gave him a disparately high sentence compared to other "first-time offenders" convicted of "financial crimes." In what follows, we explain why we (siding with the government) believe the judge abused no discretion here.

A judge must steer clear of "unwarranted sentenc[ing] disparities" among "similar" offenders. 18 U.S.C. § 3553(a)(6). "Even so, a genuine sentence disparity can only exist between two identically situated defendants." United States v. Candelario, 105 F.4th 20, 24 (1st Cir. 2024) (quotation omitted). Where "material differences between the defendant and the proposed comparator suffice to explain the divergence," a sentencing-disparity claim "may easily be repulsed." United States v. Demers, 842 F.3d 8, 15 (1st Cir. 2016).

Switching back to Abbas's situation, we reject any suggestion by him that the judge ignored the need to avoid unjustified disparities. The sentencing commission thought about sentencing-disparity avoidance when it drafted the guidelines. See, e.g., Gall v. United States, 552 U.S. 38, 54 (2007). So when judges "correctly calculate[] and carefully review[] the [g]uidelines range," they consider the need to avoid sentencing disparities. Id. The judge did both things here. Which means that the judge "necessarily gave significant weight and

consideration" to this factor.  Id.  We also know that the judge considered the unwarranted-disparities factor because the parties argued about it at resentencing — with the judge ultimately finding that Abbas hadn't developed a match between his circumstances and his suggested comparators'.  Listing key facts distinguishing his case from the others, the judge spotlighted

- his being "a lawyer" who "used his law license to perpetuate the fraud";

- his "appreciating that it was fraud" long "before the arrest" but not "chang[ing] course" even after banks "confronted" him; and

- his not doing much to return the loot despite knowing that "people were duped" and "wanted their money back."

And that segues nicely into Abbas's next two arguments, neither particularly persuasive.

Citing a handful of cases (from this circuit and otherwise),[13] Abbas says that "a sentence of 30 months" would've prevented the sentencing disparity.  But even a quick reading of those opinions makes clear that he's comparing incomparables, because none of them involved the mix of factors (bulleted above)

_____

[13] United States v. McLellan, 959 F.3d 442 (1st Cir. 2020), United States v. Prosperi, 686 F.3d 32 (1st Cir. 2012), United States v. Thurston, 544 F.3d 22 (1st Cir. 2008), United States v. Watt, 707 F. Supp. 2d 149 (D. Mass. 2010), and United States v. Adelson, 441 F. Supp. 2d 506 (S.D.N.Y. 2006).

- 31 -

that drove his sentence (as the government also notes, without denial).  See, e.g., United States v. Flores-Machicote, 706 F.3d 16, 24 (1st Cir. 2013) (observing that "[c]omparing apples to oranges is not a process calculated to lead to a well-reasoned result" when a defendant alleges sentencing disparity); see also United States v. Rodríguez-Adorno, 852 F.3d 168, 177 (1st Cir. 2017) (expressing that "[a] credible claim of sentencing disparity requires that the proponent furnish the court with enough relevant information" to show "that . . . his" comparisons involve like-situated persons).

Citing a pair of opinions (both outside this circuit),[14] Abbas then accuses the judge of not considering national sentencing statistics.  The judge did say that "as a general proposition" he (the judge) thought "little" of JSIN data because JSIN didn't include enough context for making a comparison to Abbas's "specific facts."[15]  See generally United States v. Joubert, 778 F.3d 247,

---

[14] United States v. Guevara-Lopez, 147 F.4th 1174 (10th Cir. 2025), and United States v. Hymes, 19 F.4th 928 (6th Cir. 2021).

[15] "JSIN" is an anacronym for "Judiciary Sentencing Information," an online sentencing-data resource run by the sentencing commission that provides a snapshot of how judges nationally sentence defendants "under the same primary guideline, and with the same [f]inal [o]ffense [l]evel and [c]riminal [h]istory [c]ategory, for the past five fiscal years."  See U.S. Sent'g Comm'n, Judiciary Sentencing Information, https://www.ussc.gov/guidelines/judiciary-sentencing-information [https://perma.cc/7FJQ-T7Q4].  Lumping all defendants together by the "primary guideline," JSIN doesn't distinguish between the many crimes that all mention that guideline.  And it doesn't reflect

- 32 -

256 (1st Cir. 2015) (stating that "[b]y pointing to national statistics," the defendant "compare[d] the sentence for his unique offense to the average sentence for others convicted under the same federal statute," adding that the statute covers "[a] range of conduct," and stressing that sentencing decisions "hinge primarily on case-specific and defendant-specific considerations" — all before finally concluding that his "comparison[s]" were "unhelpful" (citation omitted)). But the judge also said that he (the judge) was "really thinking about unwarranted disparities, both within the case, we don't have it here because [Abbas is] the only defendant, but also more generally," and was "open to considering" the "things that would warrant" a defendant-friendly sentence. So we think it's fair to say that the judge "did not fail to consider the sentencing statistics" but rather "justifiably disagreed with [Abbas's] view

---

how judges calculated the offense levels either. Also worth noting is that

> [t]he average and median sentencing data provided by JSIN does not reflect the [c]ommission's recommendation regarding the appropriate sentence to be imposed or represent the [c]ommission's official position on any issue or case. Nor does the information provided reflect the [c]ommission's position regarding the weight to be given, if any, to national average and median sentences in a court's determination of the appropriate sentence to be imposed.

Id.

of their importance." See United States v. Medoff, 159 F.4th 107, 127 (1st Cir. 2025) (quoting the judge as saying that "every case is unique" and that he didn't "know anything about those cases [referenced in the statistics]" — like "the history and characteristics of the [defendants]" (first alteration in original)). And even setting all that aside, the very non-binding cases Abbas favors "*do not* require district courts to consult [that] data before imposing a sentence, *nor* [do they] require district courts to follow [those] statistics when imposing sentence," see Guevara-Lopez, 147 F.4th at 1188 (emphases added) — even though that info may sometimes "be helpful," see Hymes, 19 F.4th at 935. Which is to say that he ultimately gains no mileage by premising his argument on these outside-circuit opinions.

The bottom line is that no matter how one slices it, Abbas hasn't shown that the judge's assessment falls outside "the expansive boundaries of the entire range of reasonable sentences." See United States v. Vargas-Dávila, 649 F.3d 129, 130 (1st Cir. 2011) (quotation omitted).

**Restitution**

One last topic and we're done.

The Mandatory Victim Restitution Act (the "MVRA," as it's known) requires judges to order "that the defendant make restitution to the victim of the offense." 18 U.S.C.

§ 3663A(a)(1).  And the statute says that "in the case of an offense that involves as an element a scheme," the term "victim" "includ[es] . . . any person directly harmed by the defendant's criminal conduct in the course of the scheme."  Id. § 3663A(a)(2). With that in mind, Abbas thinks the judge twice erred on the restitution front — first by including Pak Sum Low's "foreign loss[] under the wire fraud statute" (we met Low when discussing loss) and then by finding "*all* the victim's loss" attributable to him (Abbas).[16]  Using abuse-of-discretion review (as each side says we should), see United States v. Cardozo, 68 F.4th 725, 733 (1st Cir. 2023), we concur with the government that the order passes muster.

Abbas's initial argument is a repackaged version of his earlier claim that Low's loss arose from "*purely foreign* conduct" that would otherwise be "wire fraud" (emphasis added) — an argument we've already kicked to the curb.  Which (remember) is something we did because Abbas got Low's money via a wire transfer to his (Abbas's) *Illinois* account and *our* law "make[s] clear" that

---

[16] Abbas's reply brief argues that the judge relied on "[in]sufficiently reliable" evidence to support the restitution amount.  But he waived that argument by not making it in his opening brief.  See, e.g., Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc., 622 F.3d 36, 43-44 (1st Cir. 2010) (deeming arguments cursorily made in an opening brief waived, adding that "[t]he slight development in the reply brief d[id] nothing to help matters, as arguments raised there for the first time come too late to be preserved on appeal").

"[w]here a defendant is charged with wire fraud based on having sent or *received* wire communications while in the United States for the purpose of carrying out a scheme to defraud, the wire fraud statute has been applied *domestically* even if the victim is located outside the United States." See McLellan, 959 F.3d at 470 (emphases added).

Quoting United States v. Corey, 77 F. App'x 7 (1st Cir. 2003) (unpublished), Abbas next says that "un*foreseeable* consequential damages are beyond the scope of the MVRA." See id. at 10 (emphasis added). But (as the government implies, without criticism), his opening brief doesn't meaningfully engage with the judge's finding that *all* losses — including Low's — were "reasonably *foreseeable*" to him within the wire-fraud "scheme" (emphasis added). Which sinks this facet of his restitution argument (as before, his reply brief can't save him either). See, e.g., Miller, 152 F.4th at 271.[17]

## CLOSING

All that's left to say is we *affirm* the district judge's sentence and restitution order.

---

[17] If Abbas thinks his appellate papers roll out other challenges, we (at a minimum) would "find them too skeletal or confusingly constructed to be preserved." See id. at 269 (quotation omitted).